UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

ROBERT MCGRATH,

     *Plaintiff,*

     – against –

CITY OF NEW YORK,

     *Defendant.*

--------------------------------------------------------------------X

26 Civ. 5466

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Robert McGrath, by and through his undersigned counsel, for his Complaint against Defendant the City of New York, alleges as follows upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters.

### PRELIMINARY STATEMENT

1. This is a First Amendment case about the speech that riders and drivers use to find one another in the New York City markets for for-hire transportation. When Plaintiff opens his phone and selects "Uber" or "Lyft," that word tells him that the driver about to arrive has been admitted to, and remains in good standing within, a private marketplace that screens, monitors, and removes the people who operate under its name. Local Law 52 empties that word of its meaning. It forbids the only two platforms it covers from removing a driver except on the City's terms, commands the reinstatement of drivers those platforms removed up to seven years ago, and leaves the mark on the screen unchanged.

1

2.    After Local Law 52, "Uber driver" no longer reliably means "a driver Uber presently vouches for." It may instead mean "a driver Uber tried to remove, but the City would not let it." That is a government-imposed alteration of the truthful commercial information Mr. McGrath relies on every time he hires a ride. The mark is private speech. The Supreme Court has held as much: trademarks are "private, not government, speech," *Matal v. Tam*, 582 U.S. 218, 239 (2017), and they communicate exactly what a platform's mark is designed to communicate:  source, affiliation, reputation, and a continuing representation of quality.   A rider sends that message; a driver who appears under the mark receives it. The First Amendment protects both sides of the exchange, and it protects Mr. McGrath's right, as a speaker and listener, to receive that information undistorted by the government's thumb on the scale.

3.    New York City regulates for-hire transportation through the Taxi and Limousine Commission, which licenses bases, vehicles, and drivers. *See* N.Y.C. Admin. Code §§ 19-502 *et seq.* A TLC license tells a rider only that a driver has cleared the City's minimum public requirements. A platform mark tells the rider something different and more—that a particular private marketplace, with its own standards, currently stands behind the driver. The two signals are not interchangeable, and the value of the mark depends on the platform's freedom to withdraw it from drivers who no longer meet the standards the mark certifies.

4.    Local Law 52 strips that freedom away. It applies, by design, only to "high-volume for-hire vehicle services"—a category the City created in 2018 to capture Uber and Lyft and no one else. Of the approximately 868 TLC-licensed

2

bases operating in New York, the law burdens exactly two. It forbids those two platforms from deactivating a driver except for narrowly defined "just cause," a "bona fide economic reason," or where law requires it, N.Y.C. Admin. Code § 20-1282(a); imposes notice, evidentiary, and burden-of-proof rules that all run against the platform, *id.* §§ 20-1282(d), 20-1285; mandates restoration as a remedy, *id.* §§ 20-1208(c)(1), 20-1211(c); and reaches backward to compel the reinstatement of drivers removed as long ago as seven years before the law's effective date, *id.* § 20-1283(a).

5.      The practical consequence is that the platform's mark must remain attached to drivers the platform has judged unfit. The word on the screen stays the same; the message it carries changes because the government has decreed it. The change is not just temporal but geographic. The UBER and LYFT marks are uniform national marks and their value lies in their constancy.  Local Law 52 breaks that uniformity within the five boroughs. After July 28, 2026, the identical mark will mean one thing outside of New York City and a different thing in New York City. Of course, riders cannot see the municipal boundary in the app.

6.      Local Law 52 inflicts a second, independent speech injury. It compels covered services to hand a deactivated driver "[a]ll customer comments, ratings, and complaints" about him, N.Y.C. Admin. Code § 20-1286(a)(2), while requiring redaction of only names and obvious identifiers, but not the route, time, pickup point, workplace, or factual content that, in the one-on-one setting of a private vehicle, routinely identify the rider who spoke. And through a sweeping anti-retaliation provision that bars "[n]o person" from taking "adverse action" against a

3

driver and makes that prohibition privately enforceable, *id.* §§ 20-1204(a), 20-1211(a)(1), the law exposes a rider who files a truthful complaint to identification, subpoena, and suit by the very driver he reported. The predictable result is silence where candor matters most: reports of harassment, discrimination, dangerous driving, and threats.

7.    The City has ample power to protect drivers from arbitrary deactivation without rewriting private marks or chilling rider speech. It may provide neutral review, expedited arbitration, compensation, severance, advance notice, protective-order procedures, and a City-administered label of its own. It may impose a knowing-falsity threshold before a rider faces suit for a complaint. The Council chose instead to commandeer private marks to carry a government message, dilute the standards those marks certify, and conscript rider feedback into a disclosure regime that points back at the speaker.

8.    The harm to Mr. McGrath is concrete and immediate. He hires for-hire rides several times a week, often alone, often late at night, and often to and from a Midtown workplace whose location, along with his schedule, can be readily identify by drivers. He chooses among ride options based on both price and the non-price information conveyed by a particular company's mark, such as Uber or Lyft, including the level of quality and reliability the mark signifies.

9.    From the Local Law 52's first day, that information will be less accurate. From the same day, his willingness to report unsafe or harassing conduct will be diminished by the foreseeable disclosure of his words to the driver he reported and by the credible threat of suit under the "[n]o person" provision. He will

4

receive less truthful commercial speech, and he will speak less truthful commercial speech himself.  These injuries are Mr. McGrath's own, and they are distinct from any injury to Uber or Lyft. He sues as a listener whose receipt of truthful commercial information the City has degraded, and as a speaker whose truthful feedback the City will chill.[1]

10.    Mr. McGrath brings this action under 42 U.S.C. § 1983 to vindicate his rights under the First and Fourteenth Amendments. He seeks a declaration that Local Law 52 violates the First Amendment as applied to him, an injunction preventing its enforcement before it takes effect on July 28, 2026, and his fees and costs under 42 U.S.C. § 1988. The loss of First Amendment freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see Green Party of N.Y. State v. N.Y. State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004) ("[W]here a First Amendment right has been violated, the irreparable harm requirement for the issuance of a preliminary injunction has been satisfied."). Moreover, "securing First Amendment rights is in the public interest," *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), and further that "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal," *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620,

---

[1]    Two related actions by the covered platforms are already pending before the Honorable Gregory H. Woods in this District. *See Uber Techs., Inc. v. City of New York*, No. 26 Civ. 04893 (S.D.N.Y. filed June 9, 2026); *Lyft, Inc. v. City of New York*, No. 26 Civ. 04931 (S.D.N.Y. filed June 10, 2026).

637 (2d Cir. 2020). Mr. McGrath asks the Court to prevent that injury before it begins.

## JURISDICTION AND VENUE

11.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a) because this action arises under the First and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983.

12.    This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

13.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Mr. McGrath's claims has occurred and will occur in this District, including his use of covered ride-hailing marketplaces in Manhattan.

14.    A live and justiciable controversy exists. Local Law 52 "takes effect 180 days after it becomes law," N.Y.C. Local Law No. 52 § 10 (2026),[2] and is scheduled to take effect on July 28, 2026. Mr. McGrath will continue to use covered ride-hailing marketplaces after that date. Unless enjoined, Local Law 52 will alter the marketplace speech Mr. McGrath receives and chill the rider feedback he intends to provide.

---

[2]    Available at
https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=6557685&GUID=B1AD10
BE-3B1B-4782-8AE8-65B9C1E20563&Options=ID%7cText%7c&Search=276

6

## THE PARTIES

15.    Plaintiff Robert McGrath is an adult resident of Brooklyn, New York, who works at a luxury hospitality property in Midtown Manhattan. He regularly uses high-volume and other for-hire vehicle services in New York City and intends to continue doing so after Local Law 52's effective date. He chooses among ride options based on price, wait time, safety, reliability, driver quality, vehicle type, complaint handling, platform reputation, and, critically, the information conveyed by platform marks and related marketplace signals.

16.    Defendant the City of New York is a municipal corporation organized under the laws of the State of New York. The City enacted Local Law 52 and, through its officers, agencies, and employees (including the Department of Consumer and Worker Protection and the Taxi and Limousine Commission) is responsible for implementing and enforcing it.

## FACTUAL ALLEGATIONS

### A. The For-Hire Market Runs on Private Marks That Convey Information

17.    New York City regulates for-hire transportation through a public licensing regime administered principally by the Taxi and Limousine Commission ("TLC"). Approximately 180,000 individuals hold TLC licenses permitting them to work as for-hire drivers, of whom roughly 100,000 are active drivers operating through licensed bases. A TLC license is a government authorization; it tells a rider only that the driver and vehicle have cleared the City's minimum public requirements.

7

18.     A private base communicates something different and more. A "base" is a business the TLC authorizes to dispatch for-hire vehicles. There are approximately 868 TLC-authorized bases in New York City. They range from app-based platforms such as Uber, Lyft, Via, and Curb to neighborhood car services such as Dial 7, Arecibo Car Service, Eastern Car Service, and Hoyt Transportation (companies many New Yorkers know from the business cards that have long been left on their doors of business and homes in the boroughs outside of Manhattan).

19.     Each base is, in economic substance, a two-sided marketplace: it matches riders seeking transportation with drivers willing to provide it, sets standards for participation above the government's minimum, decides which drivers may operate under its name, conveys information about those drivers to riders, and facilitates what is, in law, a contract between rider and driver. In doing so, the base lowers the transaction and information costs that would otherwise make it impractical for riders and drivers to find one another.

20.     The defining value a base supplies is the reduction of information asymmetry. Before a ride begins, a rider cannot audit a driver's complaint history, safety record, customer-service record, or compliance with any platform's standards. The base closes that gap (by screening drivers, monitoring performance, investigating complaints, enforcing rules, and deciding when a driver may no longer participate) and then compresses the result into a single, low-cost signal: its mark, app interface, ride category, driver profile, rating, and reputation.

21.     A platform mark is therefore speech that conveys information. When a rider orders an Uber, the UBER mark represents that the driver has been admitted

to, and remains within, Uber's private marketplace, subject to the standards Uber attaches to that mark. "Lyft driver," "Curb taxi," "Via ride," "Dial 7 car," and "Arecibo car" are not interchangeable statements; each denotes a distinct bundle of standards, dispatch practices, complaint channels, service expectations, and price-quality tradeoffs. Product-level designations (an economy ride, a premium ride, a larger-vehicle ride, a pet-friendly ride) carry further private meaning still.

22.    This speech and informational function has grown more important as price has become transparent. Aggregators such as Obi (rideobi.com) now let riders compare the price and pickup time of Uber, Lyft, Curb, taxis, and black cars in real time; Obi's New York data, for example, show a competitor pricing rides on the order of thirty percent below Uber and Lyft. As fare comparison approaches the instantaneous, price recedes as the principal thing a mark communicates, and the non-price information the mark conveys (safety, curation, reliability, professionalism, and trust) becomes the decisive signal in a rider's choice.

23.    The Supreme Court has recognized that this kind of mark is protected private speech. A trademark identifies and distinguishes the source of goods or services and conveys a message about their nature and quality; it is private, not government, speech.

24.    The marks at issue here do exactly what the Court described: they tell riders which marketplace stands behind a given driver, and on what terms. The signal works only if the marketplace may withhold its mark from drivers who no longer meet the standards the mark certifies. As Nobel laureate George Akerlof demonstrated in his foundational study of information asymmetry, a market in

which buyers cannot tell good sellers from bad collapses toward the lowest quality: the signal deteriorates, high-quality sellers lose the benefit of their investment in quality, and the market becomes a "market for lemons." George A. Akerlof, *The Market for "Lemons": Quality Uncertainty and the Market Mechanism*, 84 Q.J. Econ. 488, 489–90 (1970). A platform's removal authority is what allows the mark to remain a credible promise both to the rider who relies on it and to the conscientious driver whose clean vehicle, safe driving, and good service it advertises.

## B. The Marketplace Conversation: "I Want an Uber Driver" and "I Will Drive as One"

25.    The app-based ride is a conversation conducted through marks. It is not a negotiation; it is a compressed exchange of offer, acceptance, affiliation, and standards. The rider's side is simple. When Mr. McGrath selects Uber, he says, in marketplace shorthand, "I want to hire an Uber driver"—which does not mean "any TLC-licensed driver," but "a driver Uber presently permits to operate under its mark and its standards."

26.    The driver's side is reciprocal. A driver who logs in, accepts a dispatch, and appears to the rider under the UBER mark says, "I am willing to be hired as an Uber driver.  They driver is saying "I offer service through Uber's marketplace, subject to Uber's rules and its continuing authorization." The mark is the shared word that makes the exchange possible without reciting, in every transaction, the platform's policies, rating thresholds, fraud controls, and removal criteria.

27.    The phrase "Uber driver" is thus not a generic occupational label. It is, at once, an affiliation message, a quality signal, and a contractual shorthand,

10

identifying both a person able to drive and a private marketplace in which that person is currently authorized to offer rides. The difference between an "Uber driver" and an "Arecibo driver" is conveyed, in material part, by the marks under which they operate; the marks let a rider select the level of service he prefers at a price he is willing to pay.

**C. The Platforms' Own Agreements Confirm That the Mark Is the Message**

28.     The covered platforms' contracts (public materials filed in the related actions before Judge Woods) confirm that their marks denote private-marketplace participation, not mere public licensure. Uber's 2015 Technology Services Agreement (the "2015 TSA") described the Uber Services as technology and "lead generation" services enabling authorized providers to receive ride requests from authorized users, and defined a "Driver" as one who meets Uber's then-current requirements and whom Uber authorizes to access the services. 2015 TSA §§ 1.4, 1.17–1.18.

29.     The 2015 TSA tied continued access to rider-facing quality. It required drivers to maintain a minimum average rating and reserved Uber's right to deactivate for unrated deficiencies, for alleged violations, and for conduct harmful to Uber's "brand, reputation or business," and it protected the "UBER Marks and Names" against unauthorized use. 2015 TSA §§ 2.4, 2.6.2, 5.3. The mark, in other words, signified Uber's continuing judgment about who could participate—not a one-time license.

30.     Uber's Platform Access Agreement, updated January 1, 2022 (the "2022 PAA"), is to the same effect and more explicit about the rider. It governs

access to a "Platform" that facilitates for-hire service "between" drivers and "Riders," conditions access on Uber's Community Guidelines, safety standards, accessibility policies, and service-animal policy, and provides that accepting a request "creates a direct business relationship" between driver and Rider. 2022 PAA, introductory clauses & § 2.6(a).

31.    Most pointedly, the 2022 PAA treats Uber-branded materials as rider-facing speech: their authorized display "may signify to Riders" that the driver's service is facilitated by Uber, and the driver must "destroy or discard" those materials upon deactivation or loss of platform access. 2022 PAA § 2.7(b), (d). The mark, by the platform's own terms, communicates *current* affiliation—precisely the message Local Law 52 disrupts. The 2022 PAA further reserves Uber's authority to deactivate for deceptive, fraudulent, unsafe, illegal, or brand-harmful activity, § 5.3, and treats rider ratings and comments as inputs that "may affect a driver's ability to access the Platform," §§ 1.1(b), 2.8.

32.    Taken together, the 2015 TSA and the 2022 PAA refute any suggestion that "Uber driver" is a synonym for "licensed driver." Across both agreements, the phrase identifies a driver whom the platform has authorized, bound to platform rules, exposed to rider ratings, subject to removal for platform-integrity reasons, and permitted to present platform-facilitated service to riders under platform-controlled marks. Local Law 52 changes who may continue to appear under the mark and on what terms, and thus changes what the rider hears and what the driver says.

### D. Local Law 52 and Its Operative Provisions

33.    Earlier this year, the City Council overrode the Mayor's veto to enact Local Law 52, codified in relevant part at Subchapter 8 of Chapter 12 of Title 20 of the New York City Administrative Code, entitled "Wrongful Deactivation of High Volume For-Hire Vehicle Drivers." N.Y.C. Admin. Code §§ 20-1281 to 20-1290; *see* N.Y.C. Local Law No. 52 (2026).[3]

34.    By design, the law reaches only the largest platforms. It applies solely to a "high-volume for-hire vehicle service," which is defined as a TLC-licensed base dispatching more than 10,000 trips per day, a category the City created in 2018 to regulate Uber and Lyft apart from traditional bases. Of the roughly 868 TLC-authorized bases in the City, Local Law 52 covers only Uber and Lyft.[4] The very marks the law burdens are thus the marks of two specific, identified speakers.

35.    The law's operative prohibition forbids a covered service from deactivating a driver after a probationary period except for "just cause," for a "bona fide economic reason," or where law requires it. N.Y.C. Admin. Code § 20-1282(a). It defines "deactivation" broadly to include not only termination but any revocation or restriction of a driver's authorization to accept trips that lasts at least 72 continuous hours or 168 hours in a year. *Id.* § 20-1281.

---

[3]    The Administrative Code of the City of New York contains the codified local laws of New York City as enacted by the New York City Council and Mayor.  It is organized by subject matter across its titles.  Title 19 of the NYC Administrative Code is "Transportation."

[4]    https://www.nyc.gov/site/tlc/businesses/high-volume-for-hire-services.page (last chechekd June 28, 2026)

36.    "Just cause" is cabined and contestable. It requires "egregious misconduct," a failure to satisfactorily perform job duties, or "other misconduct that is demonstrably and materially harmful" to the service's legitimate business interests, N.Y.C. Admin. Code § 20-1281; for any conduct short of "egregious misconduct"—itself limited to imminent dangers such as violence, sexual assault, or unlawful discrimination, *id.*—the service must prove it followed a written progressive-discipline policy, *id.* § 20-1282(c), and a fact finder weighs a seven-factor test, *id.* § 20-1282(b).

37.    The law layers on notice, evidentiary, and burden rules that all run against the platform: 14 days' advance notice for most deactivations and 120 days for economic ones, N.Y.C. Admin. Code § 20-1282(d); a bar on relying at adjudication on any reason not stated in the notice, *id.* § 20-1285(b); and the burden of proving just cause or bona fide economic reason, by a preponderance, placed squarely on the service, *id.* § 20-1285(a).

38.    The law reaches backward as well as forward. Within one year of the effective date, a driver subject to a "prior deactivation"—defined to include any deactivation in the seven years before the law took effect—may petition for reinstatement, and the service "shall reinstate or restore" access within 30 days unless the deactivation was for just cause, a bona fide economic reason, or as required by law. N.Y.C. Admin. Code §§ 20-1281, 20-1283(a).

39.    The retention command is backed by mandatory remedies. For each violation of § 20-1282 or § 20-1283, the Department "shall order reinstatement or restoration of access to the driver platform," N.Y.C. Admin. Code § 20-1208(c)(1),

and a court likewise "shall order" restoration in a private action, *id.* § 20-1211(c). The statute thus does not merely compensate a wrongly removed driver after the fact; it forces the platform's mark to remain attached to that driver going forward.

40. Two further provisions burden rider speech directly. Section 20-1286(a)(2) requires a covered service, upon deactivation, to disclose to the driver "[a]ll customer comments, ratings, and complaints received regarding" him; § 20-1286(b) requires redaction only of passengers' "personally identifiable information," and says nothing of the contextual detail—route, time, location, workplace, or the substance of the complaint—that can identify a rider in a one-on-one ride. And § 20-1204(a), as amended, provides that "[n]o person" may take "adverse action"—including "threatening, intimidating, . . . or harassing" a driver—that penalizes or is reasonably likely to deter the driver's exercise of rights under Chapter 12, a prohibition made privately enforceable, with fees, by § 20-1211(a)(1) and (b).

**E. Local Law 52 Changes the Mark, and So Changes the Message**

41. Before Local Law 52, a covered mark conveyed a single, intelligible proposition: this driver participates in this marketplace because the platform presently permits it under the platform's standards. After Local Law 52, the same mark conveys an ambiguity: this driver may participate because the platform vouches for him, or because the City has prevented, delayed, reversed, or burdened the platform's effort to remove him.

42. That ambiguity defeats the conversation. A rider can no longer reliably say "I want an Uber driver," because the City has changed what "Uber driver" includes while leaving the word on the screen unchanged. The driver can no longer

15

reliably say "I am available as an Uber driver," because the mark no longer certifies the platform's current judgment. The injury lies in the alteration of meaning, not in any alteration of letters; the City has changed the mark precisely by leaving it visually intact.

43.    The familiar analogy is a securities exchange. To say a company is "listed on the NYSE" is to say it has met and continues to meet the exchange's listing standards; the letters carry that information. A law forcing the NYSE to keep listing a company after the exchange concluded it no longer qualified would change what "NYSE-listed" means—investors could no longer tell whether a listing reflected the exchange's standards or the government's anti-delisting rule. Local Law 52 does the same to "Uber" and "Lyft." And as with delisting, the marketplace's restraint is otherwise disciplined by competition: a driver removed from one base may seek access to another, giving platforms their own incentive not to remove arbitrarily—an incentive the City's regime overrides.

44.    The change Local Law 52 works on the mark is not only temporal but geographic, and that makes the distortion especially acute. The UBER and LYFT marks are uniform, national marks, and their value lies in their constancy.  A national mark is, by design, a promise that does not change at the city line.

45.    Local Law 52 breaks that uniformity within, and only within, the five boroughs. After the law takes effect, "Uber" will carry one meaning everywhere else in the country and a different meaning in New York City. Outside the City, the mark continues to certify that the platform currently stands behind the driver under its own standards; inside the City, the identical mark may instead signal a

driver the platform judged unfit but was forbidden to remove under the City's just-cause regime. The City has thus legislated a second, local definition of a national word while leaving the word itself untouched.

46.    Riders cannot see that municipal boundary in the application. The interface looks the same in Times Square as it does just outside the City.

47.    The visitor who lands at LaGuardia, the business traveler who rides in a dozen cities, and the New Yorker who travels and returns all carry a national understanding of the mark into a local market in which the City has quietly changed its content. The mark looks uniform but is not, and the rider is left to rely on a signal the City has hollowed out for New York alone. That is a government-compelled geographic dilution of private speech: the City has made "Uber" say less here than it says anywhere else, without telling the people who rely on it.

48.    The distinction the law erases is material to riders. Whether a driver remains because a platform chose to retain him or because the City forbade his removal bears on safety, on quality, on a rider's willingness to ride alone, to pay a premium, to prefer one service over a cheaper competitor, or to recommend it to others. Local Law 52 is most consequential precisely in the broad zone below imminent public-law disqualification—repeated unprofessional conduct, poor service, unsafe but non-catastrophic driving, route manipulation, low reliability, app misuse, repeated rider complaints—where private marks do their work and where the City supplies no public floor.

49.    The same dilution harms conscientious drivers. A driver who keeps a clean car, drives safely, and avoids complaints benefits only if the mark credibly

17

tells riders that participating drivers meet those standards. When the City forces the mark to cover drivers the platform would remove, it takes value from the drivers who earned it—the market-for-lemons dynamic, imposed by law.

50. The City had means to protect drivers without rewriting private marks. It could provide independent or expedited neutral review, compensation or severance, neutral arbitration, City-administered benefits, targeted notice, or protective-order procedures. It could even create its own label to identify drivers whose continued access the City requires. It chose none of these. Instead it conscripted private marks to carry the City's retention message while denying riders any way to tell platform-selected participation from City-compelled participation.

### F. The Legislative Record Confirms a Driver-Retention Purpose and Available Alternatives

51. The legislative record confirms that Local Law 52, introduced as Intro. 276, was framed and adopted as a driver-retention and worker-protection measure—not as a consumer-disclosure law designed to preserve the accuracy of rider-facing signals. At the September 27, 2024, hearing of the Council's Committee on Transportation and Infrastructure, the bill's sponsor described unfair deactivation as the single biggest issue drivers faced after the medallion crisis and cast the bill as a "due process standard" and a "fundamental" worker-rights protection, built around progressive discipline, advance notice, an appeals process, access to information, a burden shifted to the companies, and back pay.

52.    The agencies and advocates spoke in the same register. The TLC and the Department of Consumer and Worker Protection supported the bill as a fair-labor measure addressing the financial harm of arbitrary deactivation; the New York Taxi Workers Alliance emphasized deactivations "without a fair reason, without notice" and the remedies of "reinstatement, backpay, and civil penalties."

53.    None of these objectives required the City to alter the rider-facing meaning of a private mark.  The record also shows the City had less speech-restrictive alternatives in hand. Uber testified that it already provides pre-deactivation education and notice, identifies fraudulent rider allegations, and offers an in-app review center, human review, and an IDG/AAA appeals process that resolves 95 percent of cases within 72 hours of submission, and that permanent deactivations (about one percent of drivers) largely involve fraud or safety. The Independent Drivers Guild, opposing the bill, identified existing grievance procedures and professional-development classes for drivers whose ratings fell below 4.75. The City could have enhanced these mechanisms; it chose instead to compel continued operation under private marks.

54.    The scale confirms the stakes for riders. The TLC testified that high-volume services completed more than 18 million trips in a single recent month; advocates estimated deactivation cases in the thousands to upward of 13,000 per year. Local Law 52 will thus operate across an enormous consumer marketplace, altering the signal on which millions of monthly trips depend.

55.    Finally, the record confirms that rider speech sits at the center of the regime. Deactivation disputes turn heavily on rider complaints and ratings, and the

19

law's response is to compel disclosure of that rider speech to the driver. The Council heard that complaints often involve ride-specific events (*e.g.*, intoxication allegations, service-animal refusals, unsafe driving, illegal-turn requests, passenger-driver altercations)—the very category of facts from which a driver can identify the rider who spoke.

### G. The Disclosure and "No Person" Provisions Chill Rider Speech

56.    Rider ratings, comments, and complaints are speech. They express a rider's views on safety, professionalism, discrimination, harassment, vehicle condition, and routing—matters of obvious concern to the marketplace and to public safety. The First Amendment protects that speech, and it protects the right to deliver it without compelled exposure to the person criticized.

57.    Section 20-1286(a)(2)'s command that covered services disclose to a deactivated driver "[a]ll customer comments, ratings, and complaints" about him predictably chills that speech. The statute's lone safeguard—redaction of "personally identifiable information," § 20-1286(b)—does not reach the contextual detail that identifies a rider in the intimate setting of a private car. A driver can often infer who complained from the route, the time, the pickup or drop-off point, the workplace, or the content of the complaint itself, even with a name removed.

58.    The "[n]o person" provision sharpens the threat. On its face, § 20-1204(a) reaches anyone—not just platforms or employers, terms the law uses elsewhere—and its definition of "adverse action" sweeps in "threatening, intimidating, . . . or harassing" a driver and "discriminating against" him. Coupled with the compelled disclosure of rider complaints under § 20-1286(a)(2) and the

20

private right of action under § 20-1211(a)(1), the provision creates a credible threat that a rider who files a truthful negative report may be identified, accused of retaliation or harassment, subpoenaed, or named in a civil suit by the driver he reported. A rider need not be sure he would lose such a suit; the objectively reasonable prospect of identification, litigation cost, and retaliatory process is itself the injury.

59.     The chill is acute precisely where candid feedback matters most—reports of harassment including sexual harassment, threats, discrimination, dangerous driving, or refusal of service—and the City's interest in fair adjudication does not require it. Less restrictive alternatives are obvious and were before the Council: disclosure to a neutral fact finder under protective order, *in camera* review, redacted summaries, counsel-only disclosure, a safe harbor for truthful or good-faith complaints, or a proof-of-knowing-falsity threshold before any rider faces liability. By forgoing all of them, Local Law 52 burdens far more rider speech than any legitimate interest can justify.

### H. Plaintiff Relies on These Messages and Will Be Injured

60.     Mr. McGrath regularly uses app-based for-hire services in New York City, including rides to and from his workplace and rides in which he is alone with a driver he does not know. He places weight on safety, professionalism, discretion, reliability, and the ability to give truthful feedback about driver conduct.

61.     Mr. McGrath understands that the City sets a public licensing floor and that platforms set private standards above it and decide which drivers may operate under their marks. When he selects Uber, Lyft, or another covered

marketplace, he is not indifferent to the mark; he relies on it to tell him that the platform itself has chosen to stand behind the driver under the platform's current standards. If the mark no longer reliably carries that message, he receives less accurate information, faces higher search costs and greater uncertainty about driver quality, and must decide among riding on distorted information, paying more or waiting longer for a substitute, or forgoing rides he would otherwise take.

62.    Mr. McGrath also uses, and intends to keep using, rider ratings, comments, and complaint channels to report unsafe, threatening, discriminatory, harassing, or otherwise concerning conduct. He is materially less likely to provide candid, specific feedback if Local Law 52 requires that feedback to be disclosed to the driver in a manner that could reveal his identity, his workplace, his routine, or the details of his ride, or if it exposes him to suit under the "[n]o person" provision. He will self-censor.

63.    Mr. McGrath's injuries are his own and are distinct from any injury to Uber or Lyft. He sues as a listener and recipient of commercial information the City has degraded, and as a speaker whose truthful feedback the City will soon chill.

### I. Irreparable Harm

64.    Local Law 52 takes effect on July 28, 2026. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.

65.    From the law's first day, Mr. McGrath will receive less accurate marketplace information at the point of choosing a ride, unable to tell whether a

22

driver under a covered mark is there because the platform vouches for him or because the City compelled it.

66.    He will simultaneously be chilled from providing candid ratings, comments, and complaints by the foreseeable disclosure of that speech to deactivated drivers and by the credible threat of identification, subpoena, and suit under the "[n]o person" provision. Money damages cannot remedy the loss of accurate information, the chilling of speech, or the forced choice between riding on distorted signals and abandoning covered services. The public interest favors relief: riders, drivers, and marketplaces alike benefit when truthful commercial signals stay accurate and when riders can speak without fear of exposure to the subject of their complaint.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(First Amendment — Burden on the Right to Receive Truthful, Non-Misleading Commercial Information; 42 U.S.C. § 1983)**

67.    Mr. McGrath realleges and incorporates each preceding paragraph.

68.    The First Amendment protects the right to receive information and ideas, including truthful, non-misleading commercial information, and that protection runs to the recipient as well as the source.

69.    The platform marks, app interfaces, ride categories, driver profiles, ratings, and curated signals at issue are protected commercial speech. They concern lawful services, are material to rider choice, and convey non-misleading information about a platform's curation, standards, affiliation, and quality.

70.    Local Law 52 burdens Mr. McGrath's right to receive that information by altering the meaning of covered marks—forcing platforms to keep identifying as participants drivers they have judged unfit, unless they satisfy the City's just-cause regime, N.Y.C. Admin. Code §§ 20-1282(a)–(d), 20-1283(a), 20-1285(a)–(b), and enforcing that command through mandatory restoration remedies, *id.* §§ 20-1208(c)(1), 20-1211(c). The law thereby deprives him of accurate information about whether a driver's presence under a mark reflects the platform's judgment or the City's compulsion.

71.    The City has no legitimate interest in making marketplace marks less informative to riders, and even a substantial interest in preventing arbitrary deactivation is not directly advanced by distorting the information riders receive. The law is more extensive than necessary; the City could pursue driver protection through review, compensation, arbitration, notice, or its own disclosures without forcing private marks to carry altered signals. Local Law 52 thus fails the scrutiny applicable to burdens on truthful commercial speech, and violates the First Amendment as applied to Mr. McGrath. He is entitled to declaratory and injunctive relief under 42 U.S.C. § 1983.

**SECOND CLAIM FOR RELIEF**

**(First Amendment — Compelled Alteration of Private Marks and Affiliation Speech; 42 U.S.C. § 1983)**

72.    Mr. McGrath realleges and incorporates each preceding paragraph.

73.    Trademarks and service marks are private speech that communicates source, affiliation, reputation, and quality. The First Amendment forbids the

government from compelling a private party to carry a message it would not, or from materially altering the content of private expression; that protection extends to listeners with a reciprocal interest in receiving uncoerced private speech.

74.    Local Law 52 compels a materially altered affiliation message. By forbidding deactivation except on the City's terms, mandating advance notice, commanding reinstatement of prior deactivations, placing the burden on the service, and ordering restoration as a remedy, N.Y.C. Admin. Code §§ 20-1282(a), (d), 20-1283(a), 20-1285(a), 20-1208(c)(1), 20-1211(c), the law forces covered services to keep presenting drivers under their marks when the services would disassociate from them.

75.    The message to Mr. McGrath ceases to be "this driver operates under this platform's standards" and becomes "this driver operates under this platform's mark, though the City may have blocked his removal." The same provisions give the mark one meaning within New York City and another outside of New York City, compelling covered services to convey a City-specific message to riders who understand the mark nationally. The compulsion is content-based and speaker-based: it singles out two identified marketplaces and changes the content of their affiliation speech to serve a government-preferred retention policy. It cannot satisfy strict scrutiny; the City has no compelling interest in diluting private marks or forcing riders to receive a government-altered signal, and the law is not narrowly tailored—it sweeps across safety, quality, fraud, and service standards and reaches back seven years. Nor is it a permissible factual disclosure to prevent deception; it compels continued affiliation and changes the mark's meaning. The law fails even

intermediate scrutiny. Mr. McGrath is entitled to declaratory and injunctive relief under 42 U.S.C. § 1983.

## THIRD CLAIM FOR RELIEF

### (First Amendment — Chilling of Rider Ratings, Comments, and Confidential Speech; 42 U.S.C. § 1983)

76.    Mr. McGrath realleges and incorporates each preceding paragraph.

77.    Rider ratings, comments, and complaints are protected speech, and the First Amendment protects the ability to speak without compelled exposure to retaliation or identification; compelled-disclosure regimes that expose speakers to such risks must satisfy exacting, and in appropriate cases strict, scrutiny.

78.    Section 20-1286(a)(2) compels covered services to disclose to deactivated drivers "[a]ll customer comments, ratings, and complaints" about them, and § 20-1286(b)'s redaction of "personally identifiable information" does not reach the contextual detail that identifies a rider in a one-on-one ride. The mandate chills Mr. McGrath's intended feedback, most severely for reports of harassment, threats, discrimination, dangerous driving, or refusal of service.

79.    The City has no sufficiently important interest in forcing rider speech to the subject of the complaint in a manner that invites reidentification and retaliation, and less restrictive alternatives—neutral in camera review, protective orders, redacted summaries, counsel-only review, or disclosure to a fact finder rather than the driver—are readily available. The provision is not narrowly tailored and burdens far more rider speech than necessary, violating the First Amendment. Mr. McGrath is entitled to declaratory and injunctive relief under 42 U.S.C. § 1983.

## FOURTH CLAIM FOR RELIEF

**(First Amendment — Threat of Civil Liability Against Riders Under the "No Person" Provision; 42 U.S.C. § 1983)**

80.    Mr. McGrath realleges and incorporates each preceding paragraph.

81.    Section 20-1204(a), as amended, provides that "[n]o person" may take adverse action against a covered driver that penalizes or is reasonably likely to deter the driver's exercise of rights under Chapter 12. On its plain text, "[n]o person" reaches riders; the law neither says "no employer" or "no platform" nor exempts passengers, complainants, or those who submit ratings or comments. Section 20-1211(a)(1) makes the prohibition privately enforceable, with compensatory, injunctive, and declaratory relief and fees. N.Y.C. Admin. Code § 20-1211(a)(1), (b).

82.    Combined with the compelled disclosure of rider complaints under § 20-1286(a)(2), these provisions create a credible First Amendment threat: a driver who receives Mr. McGrath's truthful complaint may assert that it was an "adverse action," constituted harassment or intimidation, or was likely to deter his exercise of statutory rights, and may identify, accuse, subpoena, or sue him. The First Amendment protects against laws that objectively chill speech by exposing speakers to such credible threats of enforcement, liability, compelled identification, and litigation cost; Mr. McGrath need not show that any such claim would ultimately succeed.

83.    The provision is not narrowly tailored to any legitimate interest. The City can shield drivers from platform retaliation without exposing riders to liability for truthful safety and quality complaints—by limiting § 20-1204(a) to platforms,

27

employers, and their agents, exempting rider feedback, creating a safe harbor for good-faith complaints, or requiring proof of knowing falsity. By using "[n]o person" language that reaches riders and making it privately enforceable alongside compelled disclosure, Local Law 52 chills Mr. McGrath's protected speech and violates the First Amendment. He is entitled to declaratory and injunctive relief under 42 U.S.C. § 1983.

**FIFTH CLAIM FOR RELIEF**

**(First Amendment — Third-Party Assertion of the Rights of Conscientious Drivers; 42 U.S.C. § 1983)**

84.    Mr. McGrath realleges and incorporates each preceding paragraph.

85.    A platform mark is the driver's speech as well as the rider's. A driver who satisfies a platform's standards uses the mark to tell riders that he has done so: to appear under the UBER mark is to say "I am an Uber driver," meaning a driver Uber presently authorizes under its standards. That affiliation message is protected private expression. *Matal v. Tam*, 582 U.S. at 235. By forcing the mark to remain attached to drivers the platform would remove, Local Law 52 distorts and dilutes the conscientious driver's own message, draining it of the meaning that made it worth sending and impairing his ability to distinguish himself from drivers who do not meet the same standards.

86.    Mr. McGrath has standing to assert these drivers' First Amendment interests. He satisfies Article III in his own right: he has alleged a concrete and particularized injury—degraded marketplace information and chilled speech—that is fairly traceable to Local Law 52 and redressable by the relief he seeks. His

standing to raise the drivers' rights is therefore additional to, not a substitute for, his own.

87.     Mr. McGrath also satisfies the requirements for third-party standing. A rider and the driver who serves him are the two parties to the marketplace conversation the mark mediates; the rider is the intended recipient of the driver's affiliation message and relies on it in choosing a ride. That direct, transactional relationship supplies the close relationship that permits a litigant to assert a third party's rights.

88.     Conscientious drivers also face genuine obstacles to vindicating their own interest in the integrity of the mark. The dilution harm is diffuse and shared: each qualifying driver's marginal loss of signal value is difficult to isolate or monetize, creating a collective-action barrier to suit. A driver who challenged the City's retention regime would have to oppose publicly a measure cast as worker protection, and would risk platform discipline and peer retaliation—deterrence the law's own broad anti-retaliation machinery compounds. The drivers with the clearest and best-resourced incentive to litigate—those who were deactivated—hold interests opposed to the mark-integrity claim, and the platforms' pending suits vindicate the platforms' rights, not the drivers' distinct speech interest.

89.     The First Amendment context further relaxes the prudential limits on third-party standing, permitting a litigant who has suffered his own injury to assert that a law unconstitutionally burdens the protected expression of others.

90.     Because Local Law 52 burdens the protected affiliation speech of drivers who satisfy the platforms' standards, and because Mr. McGrath has

29

standing to assert that burden, he is entitled to declaratory and injunctive relief under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Robert McGrath respectfully requests that the Court enter judgment in his favor and grant the following relief:

a) A declaration that Local Law 52 violates the First Amendment as applied to Plaintiff and similarly situated riders who receive and rely on covered marketplace speech and who provide rider ratings, comments, and complaints;

b) A declaration that Local Law 52 is unconstitutional to the extent it requires covered services to permit drivers to continue operating under private marks contrary to the platforms' own standards, thereby materially altering the marketplace information riders receive;

c) A declaration that Local Law 52 is unconstitutional to the extent it requires disclosure to drivers of rider comments, ratings, and complaints in a manner that chills rider speech or creates a material risk of rider reidentification;

d) A declaration that Local Law 52 is unconstitutional to the extent N.Y.C. Administrative Code § 20-1204(a), together with §§ 20-1211 and 20-1286, applies to riders or creates a credible threat that riders may be identified, subpoenaed, accused of wrongdoing, or subjected to civil liability based on truthful ride-related speech;

e) A declaration that Local Law 52 is unconstitutional to the extent it gives covered marks a meaning within New York City different from the meaning they bear elsewhere and burdens the protected affiliation speech of drivers who satisfy the platforms' standards;

f) Preliminary and permanent injunctive relief enjoining the City and its officers, agents, employees, and all persons acting in concert with them from implementing or enforcing Local Law 52, including N.Y.C. Administrative Code §§ 20-1204, 20-1211, and 20-1281 through 20-1290, to the extent necessary to remedy the First Amendment violations alleged herein;

g) An order staying and restraining the effective date and enforcement of Local Law 52 pending final judgment on the merits;

h)      An award of Plaintiff's costs, expenses, and reasonable attorneys' fees under 42 U.S.C. § 1988 and any other applicable law; and

i)       Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all issues so triable.

Dated: June 28, 2026
        Long Island City, New York

**KASELL LAW FIRM**

By: /s/ *David Kasell*
David Kasell, Esq.
*Attorney for Plaintiff Robert McGrath*
1038 Jackson Avenue, Suite #4
Long Island City, New York 11101
Office: (718) 404-6668
Email: david@kaselllawfirm.com

31