UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ROBERT MCGRATH,

    *Plaintiff,*

    - against -

CITY OF NEW YORK,

    *Defendant.*
-------------------------------------------------------------------X

26 Civ. 5466

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

David Kasell, Esq.
Attorney for Plaintiff Robert McGrath
1038 Jackson Avenue, Suite #4
Long Island City, NY 11101

## TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................ 1

LEGAL STANDARD FOR A PRELIMINARY INJUNCTION ............................. 3

FACTUAL BACKGROUND ................................................................................... 5

    A. The For-Hire Market Runs on Private Marks That Convey Information ... 5

    B. The Platform's Power to Remove Drivers Polices the Everyday Conduct Riders Experience ................................................................................. 8

    C. Local Law 52 and Its Operative Provisions .................................................. 10

    D. Local Law 52 Changes the Mark, and So Changes the Message ............... 12

    E. Plaintiff Relies on These Messages and Will Be Injured ........................... 13

ARGUMENT: EACH OF PLAINTIFF'S CLAIMS WARRANTS A PRELIMINARY INJUNCTION ...................................................................... 14

    I. Claim One: Local Law 52 Burdens Plaintiff's Right to Receive Truthful, Non-Misleading Commercial Information .................................................. 15

    II. Claim Two: Local Law 52 Compels a Material Alteration of Private Marks and Affiliation Speech ................................................................................. 17

    III. Claim Three: Local Law 52 Chills Rider Ratings, Comments, and Confidential Speech .................................................................................... 20

    IV. Claim Four: Local Law 52 Creates a Credible Threat of Civil Liability Against Riders Under the "No Person" Provision .................................... 22

    V. Claim Five: Plaintiff May Assert the First Amendment Rights of Conscientious Drivers, Who Are Likewise Injured .................................. 24

    VI. Irreparable Harm, the Balance of Equities, and the Public Interest All Favor an Injunction on Every Claim ........................................................ 25

CONCLUSION ...................................................................................................... 27

## TABLE OF AUTHORITIES

*Page(s)*

### CASES

*725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424 (S.D.N.Y. 2019) ... 3, 4, 15, 27

*A.H. v. French*, 985 F.3d 165 (2d Cir. 2021) ............................................................. 3, 27

*Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020) ....................................... 27

*Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019) ................ 4, 26

*Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) ........................ 20

*Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979) ..................... 5

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) .................................................................. 15

*Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018) ................................. 3

*Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996) ..................................... 4, 15, 26

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) .................................................. 19

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) ............................... 19

*Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980) ...................................................................................................... 15, 16, 17

*Chiles v. Salazar*, No. 24-539 (U.S. Mar. 31, 2026) .................................................. 17

*DoorDash, Inc. v. City of New York*, 789 F. Supp. 3d 337 (S.D.N.Y. 2025) ......... 17, 21

*Edenfield v. Fane*, 507 U.S. 761 (1993) ...................................................................... 16

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................... 3, 4, 15, 25

*First Choice Women's Resource Centers, Inc. v. Davenport*, No. 24-781 (U.S. Apr. 29, 2026) ................................................................................................................. 5, 23

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) ................................ 15

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995) ................................................................................................................. 18

*Iancu v. Brunetti*, 588 U.S. 388 (2019) ...................................................................... 17

*Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023) ................. 17

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ................................................................... 24

*Ligon v. City of New York*, 925 F. Supp. 2d 478 (S.D.N.Y. 2013) ............................... 4

*Mastrio v. Sebelius*, 768 F.3d 116 (2d Cir. 2014) ........................................................ 4

*Matal v. Tam*, 582 U.S. 218 (2017) .............................................................. 1, 17, 24

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) .................................. 20

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ....................................... 18

*Mullins v. City of New York*, 626 F.3d 47 (2d Cir. 2010) ....................................... 4, 26

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ...................................... 20

*National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018) ....... 18

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................................... 3, 27

*N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013).................... 27

*Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Financial Services*, 769 F.3d 105 (2d Cir. 2014) ....................................................................................... 4

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015)........................................................... 17

*Riley v. National Federation of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) ........... 18

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ......................... 4

*Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947 (1984)........ 25

*Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) ....................................................... 19

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) .................................................. 15, 19

*Statharos v. N.Y.C. Taxi & Limousine Commission*, 198 F.3d 317 (2d Cir. 1999) ... 26

*trueEx, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705 (S.D.N.Y. 2017) ................... 5

*United States v. Playboy Entertainment Group*, 529 U.S. 803 (2000) ...................... 16

*University of Texas v. Camenisch*, 451 U.S. 390 (1981)............................................... 5

*USPTO v. Booking.com B.V.*, 591 U.S. 549 (2020) .................................................... 17

*Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988) ......................... 5, 23, 25

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976).................................................................................. 15, 18

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ....................... 3

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) .............................. 19

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ..................................................................................passim

## STATUTES AND LOCAL LAWS

N.Y.C. Local Law No. 52 (2026).................................................................passim

N.Y.C. Admin. Code § 20-1204(a) ......................................................... 2, 12, 22

N.Y.C. Admin. Code § 20-1208(c)(1) ........................................................ 12, 18

N.Y.C. Admin. Code § 20-1211(a)(1) ................................................................. 2, 12, 22

N.Y.C. Admin. Code § 20-1211(b) ............................................................................ 12, 22

N.Y.C. Admin. Code § 20-1211(c) ............................................................................ 12, 18

N.Y.C. Admin. Code § 20-1281 ................................................................................ 11, 12

N.Y.C. Admin. Code §§ 20-1281 to 20-1290 ......................................................... 10, 27

N.Y.C. Admin. Code § 20-1282(a) ..................................................................... 1, 9, 11, 18

N.Y.C. Admin. Code § 20-1282(b) ............................................................................. 9, 11

N.Y.C. Admin. Code § 20-1282(c) ............................................................................. 9, 11

N.Y.C. Admin. Code § 20-1282(d) ........................................................................ 9, 11, 18

N.Y.C. Admin. Code § 20-1283(a) ........................................................................ 1, 12, 18

N.Y.C. Admin. Code § 20-1285(a) ........................................................................ 9, 11, 18

N.Y.C. Admin. Code § 20-1285(b) ................................................................................ 11

N.Y.C. Admin. Code § 20-1286(a)(2) .............................................................. 2, 12, 21, 22

N.Y.C. Admin. Code § 20-1286(b) ..................................................................... 2, 12, 21

## OTHER AUTHORITIES

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and
Procedure § 2948.1 (2d ed. 1995) ...................................................................... 4

## PRELIMINARY STATEMENT

This is a First Amendment case about the marks and words riders and drivers use to find one another in New York City's markets for for-hire transportation. When Plaintiff Robert McGrath opens his phone and selects "Uber" or "Lyft," that word tells him that the driver about to arrive has been admitted into a private marketplace that screens, monitors, and removes the people who operate under its name, and whom the platform is presently willing to stand behind. *See* CM ECF No. 1("Compl.") ¶1; McGrath Decl. ¶¶5-6.

Local Law 52 of 2026 empties that word of its meaning. It forbids the only two platforms it covers from removing a driver except on the City's terms, N.Y.C. Admin. Code § 20-1282(a); Compl. ¶¶4, 35, and commands the reinstatement of drivers those platforms removed up to seven years before the law's effective date, N.Y.C. Admin. Code § 20-1283(a); Compl. ¶38, while leaving the mark on the rider's screen unchanged, Compl. ¶42; McGrath Decl. ¶19. After Local Law 52, "Uber driver" no longer reliably means "a driver Uber presently vouches for." It may instead mean "a driver Uber tried to remove, but the City would not let it." Compl. ¶2; McGrath Decl. ¶18.

That government-enforced alteration injures Mr. McGrath in three distinct ways. *First*, it changes and degrades the truthful commercial information he relies on every time he hires a ride, because he can no longer tell whether a driver appears under a covered mark by the platform's choice or by the City's command. McGrath Decl. ¶¶6-7, 18-20; Compl. ¶¶8-9. A trademark is "private, not government, speech," *Matal v. Tam*, 582 U.S. 218, 239 (2017), and a platform mark

1

communicates exactly what it is designed to communicate:  source, affiliation, reputation, and a continuing representation of quality; a rider sends that message when he selects a platform, and a driver who appears under the mark receives it. Compl. ¶¶2, 25-26. The right to receive that information belongs to the listener no less than to the source.

*Second*, the law compels the covered platforms to keep presenting under their marks drivers they would remove:  a government-forced alteration of private affiliation speech that Mr. McGrath, as the intended audience, has a reciprocal right not to receive in distorted form. Compl. ¶¶73-75; McGrath Decl. ¶¶10-17.

*Third*, Local Law 52 inflicts a separate injury on Mr. McGrath's own speech. It compels the covered services to hand a deactivated driver "[a]ll customer comments, ratings, and complaints" about him, N.Y.C. Admin. Code § 20-1286(a)(2); Compl. ¶40, while requiring redaction of only names and obvious identifiers, but not the route, time, pickup point, workplace, or factual content that, in the one-on-one setting of a private vehicle, routinely identifies the rider who spoke, N.Y.C. Admin. Code § 20-1286(b); Compl. ¶57; McGrath Decl. ¶28.

And through a sweeping anti-retaliation provision barring "[n]o person" from taking "adverse action" against a driver, made privately enforceable with fees, N.Y.C. Admin. Code §§ 20-1204(a), 20-1211(a)(1); Compl. ¶40, the law exposes a rider who files a truthful complaint to identification, subpoena, and suit by the very driver he reported, Compl. ¶¶58, 81-82; McGrath Decl. ¶¶29-30. The predictable result is silence where candor matters most: reports of harassment, discrimination, dangerous driving, and threats. Compl. ¶59; McGrath Decl. ¶¶29, 31.

2

Mr. McGrath is likely to succeed on each of his five First Amendment claims, and he need prevail on only one to obtain relief. The loss of First Amendment freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality), and the balance of equities and public interest both favor relief, because "[t]he public interest . . . is well served" by correcting constitutional harms, *A.H. v. French*, 985 F.3d 165, 184 (2d Cir. 2021), and the City "does not have an interest in the enforcement of an unconstitutional law," *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 470 (S.D.N.Y. 2019). The City has ample, less speech-restrictive ways to protect drivers from arbitrary deactivation (*e.g.*, neutral review, arbitration, compensation, severance, advance notice, protective-order procedures, and a City-administered label of its own). Compl. ¶¶7, 50.

The Court should enjoin Local Law 52 before it takes effect on July 28, 2026.

## LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted).

The "balance of hardships" and "public interest" factors "merge" into one when the government is the defendant. *725 Eatery Corp.*, 408 F. Supp. 3d at 469; *see Nken v. Holder*, 556 U.S. 418, 435 (2009); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 436 (E.D.N.Y. 2018). Because Plaintiff seeks to halt the enforcement of a

3

legislative enactment, he must show a likelihood of success on the merits rather than merely serious questions going to the merits, *see Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014); the relief he seeks is prohibitory (it preserves the pre-enactment status quo by preventing the City from enforcing a law that has not yet taken effect) and so is not subject to the heightened standard governing mandatory injunctions, *see Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373 (plurality op.); *see Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam). The Second Circuit accordingly holds that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir. 1996) (quoting 11A CHARLES A. WRIGHT, ARTHUR R. MILLER AND MARY KANE, FEDERAL PRACTICE AND PROCEDURE, § 2948.1 at 161 (2d ed. 1995)).

A plaintiff need only show "a threat of irreparable harm, not that irreparable harm already ha[s] occurred," *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010), and a law that "has not yet gone into effect" supplies that threat where the plaintiff shows "imminent violations of [his] constitutional rights in the absence of preliminary relief," *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 498 (S.D.N.Y. 2019) (quoting *Ligon v. City of New York*, 925 F.Supp.2d 478, 539 (S.D.N.Y. 2013)).

4

Pre-enforcement relief is available where the plaintiff has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat" of enforcement. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). As the Supreme Court explained in *Virginia v. American Booksellers Ass'n*, "the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." 484 U.S. 383, 393 (1988). And the Court recently confirmed that the threatened compelled disclosure of sensitive associational information can work a present First Amendment injury before any final compelled production.[1] *See First Choice Women's Res. Ctrs., Inc. v. Davenport*, No. 24-781, slip op. (U.S. Apr. 29, 2026).[2]

## FACTUAL BACKGROUND

### A. The For-Hire Market Runs on Private Marks That Convey Information

New York City regulates for-hire transportation through a public licensing regime administered principally by the Taxi and Limousine Commission ("TLC"). Approximately 180,000 individuals hold TLC licenses permitting them to work as for-hire drivers, of whom roughly 100,000 are active; a TLC license is a government

---

[1] It bears noting that on a preliminary injunction, where the question is whether to maintain the *status quo*, the Court's "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEx, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 720 n.108 (S.D.N.Y. 2017); *see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.").

[2] https://www.supremecourt.gov/opinions/25pdf/24-781_pok0.pdf

authorization that tells a rider only that the driver and vehicle have cleared the City's minimum public requirements. Compl. ¶17. A private base communicates something different and more. A "base" is a business the TLC authorizes to dispatch for-hire vehicles; there are approximately 868 TLC-authorized bases in the City, ranging from app-based platforms such as Uber, Lyft, Via, and Curb to neighborhood car services such as Dial 7, Arecibo, Eastern, and Hoyt. Compl. ¶18. Each base is, in economic substance, a two-sided marketplace: it matches riders with drivers, sets standards for participation above the government's minimum, decides which drivers may operate under its name, and conveys information about those drivers to riders. Compl. ¶19.

The defining value a base supplies is the reduction of information asymmetry. Before a ride begins, a rider cannot audit a driver's complaint history, safety record, or compliance with any platform's standards; the base closes that gap by screening drivers, monitoring performance, investigating complaints, enforcing rules, and deciding when a driver may no longer participate, and then compresses the result into a single, low-cost signal: its mark. Compl. ¶20. A platform mark is therefore speech that conveys information: when a rider orders an Uber, the UBER mark represents that the driver has been admitted to, and remains within, Uber's private marketplace, subject to the standards Uber attaches to that mark. Compl. ¶21; McGrath Decl. ¶6.

"Curb driver," "Lyft driver," "Curb taxi," "Via ride," and "Dial 7 car" are not interchangeable statements; each denotes a distinct bundle of standards, dispatch practices, complaint channels, service expectations, and price-quality tradeoffs.

6

Compl. ¶21. The signal works only if the marketplace may withhold its mark from drivers who no longer meet the standards the mark certifies; as the economics of information asymmetry teaches, a market in which buyers cannot tell good sellers from bad collapses toward the lowest quality—a "market for lemons." Compl. ¶24. A platform's removal authority is what allows the mark to remain a credible promise both to the rider who relies on it and to the conscientious driver whose clean vehicle, safe driving, and good service it advertises. Compl. ¶¶24, 49; McGrath Decl. ¶¶10-11.

Mr. McGrath relies on these marks as a rider. As a hospitality worker, he is aware of what good service looks like and pays close attention to the experience of being a customer. McGrath Decl. ¶4. He chooses a particular company, brand, and marketplace when he selects a service, because the name and mark communicate something specific and important to him before he ever gets in the car. McGrath Decl. ¶5.

Mr. McGrath relies on the mark because he has no other practical way to evaluate a driver: he often makes the decision on a phone, standing on a sidewalk, late at night, sometimes in bad weather, sometimes tired after a long shift, and cannot investigate a stranger's driving record, complaint history, or temperament before the car arrives. McGrath Decl. ¶7. He actively compares services and prices and pays attention to what each marketplace is known for; when he looked into Empower—which advertises that it is roughly thirty percent cheaper than Uber and Lyft—people he asked told him, in substance, that Empower is where many drivers go after being removed from Uber, and three of the six times he used Empower the

7

service was in fact substantially worse. McGrath Decl. ¶8. He values being able to make that price-quality trade-off himself, paying less for a weaker-reputation service on some nights and more for a carefully screened marketplace on others, precisely because the different marks mean different things. McGrath Decl. ¶9.

### B. The Platform's Power to Remove Drivers Polices the Everyday Conduct Riders Experience

To Mr. McGrath, the single most important thing a platform's mark communicates is not merely that a driver was screened once, at the outset, but that the platform can and will remove a driver who turns out to be a problem; that ongoing power to deactivate is what gives the mark its value. McGrath Decl. ¶10. A driver's good behavior, he explains, is not guaranteed by a license; it is held in place day to day by the knowledge that bad behavior has consequences, because a pattern of complaints, a falling rating, or a serious incident can cost the driver access to the platform; that credible possibility of removal is a constant, quiet constraint, and it is a large part of why the overwhelming majority of his rides are professional and uneventful, unlike his past experience with street-hailed taxis. McGrath Decl. ¶11.

The conduct that matters most to Mr. McGrath as a rider is usually not criminal or even egregious conduct, but the broad middle band of behavior that makes a ride either comfortable or unsettling: whether the driver is courteous or rude; whether the car is clean or dirty and whether it smells of food or other odors; whether the driver is attentive to the road or to his phone; whether he drives calmly or aggressively; whether he keeps appropriate boundaries or makes the rider uncomfortable with personal questions, comments about appearance, or unwanted

8

conversation; whether he loses his temper in traffic; and whether he respects basic requests about the route, the temperature, the music, or talking on the phone. McGrath Decl. ¶12.

Mr. McGrath relies on the platform's mark to assure him that this low-level but important misconduct is being policed: that drivers who repeatedly eat full meals in the car, play loud music or take speakerphone calls for an entire ride, drive while distracted, are short-tempered or hostile, pressure riders for cash tips, or make riders uneasy with inappropriate comments will accumulate complaints and lose access; the mark is his assurance that these red flags carry consequences. McGrath Decl. ¶13.

By stripping the covered platforms of their ability to remove drivers except on the City's narrow terms—and only after progressive discipline, advance notice, and a proceeding in which the company bears the burden of proof, N.Y.C. Admin. Code §§ 20-1282(a)-(d), 20-1285(a)—Local Law 52 removes the very incentive that keeps everyday behavior in check, so that over time the ordinary courtesy and quality of the ride will decline. McGrath Decl. ¶14; Compl. ¶¶35-37, 48.

Mr. McGrath anticipates exactly the kind of low-level problematic behavior that today usually stays in check: more drivers eating in the car, more dirty or foul-smelling vehicles, more drivers absorbed in their phones, more irritability and short tempers, more borderline or inappropriate comments, more pressure for tips, more drivers ignoring reasonable requests, and more small acts of hostility or carelessness—none of them a crime, but each degrading the ride, and together

9

exactly the conduct a platform with real removal authority can deter and a platform stripped of that authority cannot. McGrath Decl. ¶15; Compl. ¶48.

This worries him most because of how he rides: alone in a stranger's car at one or two in the morning, a driver who is angry, lacks impulse control, or does not respect boundaries is not a minor annoyance but frightening, and Local Law 52 removes his present reassurance—that such a driver will not last long on a platform whose mark he trusts—precisely in the zone of conduct short of egregious, imminent danger where he, as an everyday rider, actually lives. McGrath Decl. ¶16. He further understands that the law may require platforms to bring back drivers they previously removed, including drivers deactivated years ago, so that a driver taken off a platform for how he treated riders may return under the same mark with no way for the rider to know it. McGrath Decl. ¶17; Compl. ¶38.

### C. Local Law 52 and Its Operative Provisions

Earlier this year, the City Council overrode the Mayor's veto to enact Local Law 52, codified in relevant part at Subchapter 8 of Chapter 12 of Title 20 of the New York City Administrative Code, entitled "Wrongful Deactivation of High Volume For-Hire Vehicle Drivers." N.Y.C. Admin. Code §§ 20-1281 to 20-1290; Compl. ¶33. By design, the law reaches only the largest platforms. It applies solely to a "high-volume for-hire vehicle service"—a TLC-licensed base dispatching more than 10,000 trips per day, a category the City created in 2018 to regulate Uber and Lyft apart from traditional bases—so that, of the roughly 868 TLC-authorized bases in the City, Local Law 52 covers only Uber and Lyft. Compl. ¶34. The very marks the law burdens are thus the marks of two specific, identified speakers. Compl. ¶34.

10

The law's operative prohibition forbids a covered service from deactivating a driver after a probationary period except for "just cause," a "bona fide economic reason," or where law requires it, N.Y.C. Admin. Code § 20-1282(a); Compl. ¶35, and defines "deactivation" broadly to include any revocation or restriction of a driver's authorization to accept trips lasting at least 72 continuous hours or 168 hours in a year, *id.* § 20-1281; Compl. ¶35. "Just cause" is cabined and contestable: for conduct short of "egregious misconduct," the service must prove it followed a written progressive-discipline policy, *id.* § 20-1282(c), and a fact finder weighs a seven-factor test, *id.* § 20-1282(b); Compl. ¶36. The law layers on notice, evidentiary, and burden rules that all run against the platform: 14 days' advance notice for most deactivations and 120 days for economic ones, *id.* § 20-1282(d); a bar on relying at adjudication on any reason not stated in the notice, *id.* § 20-1285(b); and the burden of proving just cause or bona fide economic reason, by a preponderance, placed on the service, *id.* § 20-1285(a); Compl. ¶37.

The law reaches backward as well as forward: within one year of the effective date, a driver subject to a "prior deactivation"—defined to include any deactivation in the seven years before the law took effect—may petition for reinstatement, and the service "shall reinstate or restore" access within 30 days unless the deactivation met one of the statutory grounds. N.Y.C. Admin. Code §§ 20-1281, 20-1283(a); Compl. ¶38. The retention command is backed by mandatory remedies: for each violation, the Department "shall order reinstatement or restoration of access," *id.* § 20-1208(c)(1), and a court likewise "shall order" restoration in a private action, *id.* § 20-1211(c); Compl. ¶39. The statute thus does not merely compensate a wrongly

11

removed driver; it forces the platform's mark to remain attached to that driver going forward. Compl. ¶39.

Two further provisions burden rider speech directly. Section 20-1286(a)(2) requires a covered service, upon deactivation, to disclose to the driver "[a]ll customer comments, ratings, and complaints received regarding" him; § 20-1286(b) requires redaction only of passengers' "personally identifiable information" and says nothing of the contextual detail—route, time, location, workplace, or the substance of the complaint—that can identify a rider in a one-on-one ride. N.Y.C. Admin. Code § 20-1286(a)(2), (b); Compl. ¶40. And § 20-1204(a), as amended, provides that "[n]o person" may take "adverse action"—including "threatening, intimidating, . . . or harassing" a driver—that penalizes or is reasonably likely to deter the driver's exercise of rights under Chapter 12, a prohibition made privately enforceable, with fees, by § 20-1211(a)(1) and (b). N.Y.C. Admin. Code §§ 20-1204(a), 20-1211(a)(1), (b); Compl. ¶40.

### D. Local Law 52 Changes the Mark, and So Changes the Message

Before Local Law 52, a covered mark conveyed a single, intelligible proposition: this driver participates in this marketplace because the platform presently permits it under the platform's standards. After Local Law 52, the same mark conveys an ambiguity—the driver may participate because the platform vouches for him, or because the City prevented, delayed, or reversed the platform's effort to remove him. Compl. ¶¶41-42; McGrath Decl. ¶¶18-19. The change is not only temporal but geographic: the UBER and LYFT marks are uniform national marks whose value lies in their constancy, and after July 28, 2026, the identical

mark will mean one thing outside New York City and a different, weaker thing inside it—a difference riders cannot see in the app, which looks the same in Manhattan as it does in another city or state. Compl. ¶¶44-47; McGrath Decl. ¶¶24-25. The distinction the law erases is material to riders: whether a driver remains because a platform chose to retain him or because the City forbade his removal bears on safety, on quality, and on a rider's willingness to ride alone, to pay a premium, or to recommend a service to others. Compl. ¶48; McGrath Decl. ¶¶9, 16. The law is most consequential precisely in the broad zone below imminent public-law disqualification (repeated unprofessional conduct, poor service, unsafe but non-catastrophic driving, route manipulation, low reliability, app misuse, repeated rider complaints) where private marks do their work and where the City supplies no public floor. Compl. ¶48; McGrath Decl. ¶¶12, 16.

### E. Plaintiff Relies on These Messages and Will Be Injured

Mr. McGrath lives in Brooklyn and works at a luxury hospitality property in Midtown Manhattan, where his position regularly requires evening, late-night (until 2 a.m.), weekend, and holiday hours, leading him to rely on app-based for-hire vehicles to get to and from work. McGrath Decl. ¶2; Compl. ¶15. He is a frequent rider—three to five app-based rides in a typical week—many taken late at night or in the early morning, many taken alone, and many running between his Brooklyn home and his Midtown workplace, so that the drivers he rides with readily learn where he works, the hours he keeps, and the street where he lives. McGrath Decl. ¶3; Compl. ¶8. He chooses among ride options based on price and on the non-price information conveyed by a platform's mark, and relies on the mark to tell him that

13

the platform itself has chosen to stand behind the driver under its current standards. McGrath Decl. ¶¶6, 9; Compl. ¶61. If the mark no longer reliably carries that message, he will receive less accurate and less trustworthy information at the moment he most needs it, face higher search costs and greater uncertainty about driver quality, and be forced to choose among riding on a degraded signal, paying more or waiting longer for an alternative he trusts, or forgoing a ride he would otherwise take. McGrath Decl. ¶20; Compl. ¶61.

Mr. McGrath also uses, and intends to keep using, rider ratings, comments, and complaint channels to report unsafe, threatening, discriminatory, or harassing conduct, because that ability is one of his most important protections as a rider. McGrath Decl. ¶26; Compl. ¶62. He is materially less likely to provide candid, specific feedback if that feedback must be disclosed to the driver in a manner that could reveal his identity, workplace, routine, or the details of his ride, or if it exposes him to suit under the "[n]o person" provision; he states plainly that he will censor himself. McGrath Decl. ¶¶27-31; Compl. ¶62.

These injuries are his own and are distinct from any injury to Uber or Lyft: he sues as a listener whose receipt of truthful commercial information the City has degraded, and as a speaker whose truthful feedback the City will chill. Compl. ¶63; McGrath Decl. ¶32.

## ARGUMENT: EACH OF PLAINTIFF'S CLAIMS WARRANTS A PRELIMINARY INJUNCTION

Mr. McGrath is likely to succeed on each of his five claims, and he "need only show the likelihood of success" on one to warrant relief. Because every claim rests

14

on a deprivation of First Amendment freedoms, a showing of likely success on any one of them establishes irreparable harm per se, *Elrod*, 427 U.S. at 373; *Bery*, 97 F.3d at 694, and the equities and public interest follow, *725 Eatery Corp.*, 408 F. Supp. 3d at 470. Points I through V show that Mr. McGrath is likely to succeed on the merits of each claim; Point VI shows that the remaining preliminary-injunction factors are satisfied as to all of them.

## I. Claim One: Local Law 52 Burdens Plaintiff's Right to Receive Truthful, Non-Misleading Commercial Information

The First Amendment protects the right to receive information and ideas, and that protection applies with particular force where consumers seek truthful commercial information needed to make marketplace choices. In *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, the Supreme Court held that the "idea" a seller wishes to communicate—"I will sell you the X prescription drug at the Y price"—is protected commercial speech, and that "where a speaker exists, . . . the protection afforded is to the communication, to its source and to its recipients both." 425 U.S. 748, 756, 761 (1976). The doctrine is grounded in "the informational function of advertising," *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563 (1980) (*First National Bank of Boston v. Bellotti*, 435 U. S. 765, 783 (1978)), and the "creation and dissemination of information are speech within the meaning of the First Amendment," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (citing *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). The recipient's interest in receiving accurate commercial information is thus constitutionally cognizable in its own right.

15

The signals Mr. McGrath receives through platform and base marks are protected commercial speech. They concern lawful transportation services, are material to price, safety, quality, and reliability, and are compact: a rider on a sidewalk, late at night, in bad weather, cannot audit each driver's complaint history or compliance with private standards and instead relies on the mark. Compl. ¶¶20-24, 68-69; McGrath Decl. ¶¶7, 12-13. Critically, that speech is not misleading: when a platform mark reflects the platform's current private judgment, it tells the truth. Compl. ¶41; McGrath Decl. ¶¶6, 18. Local Law 52 does not cure deception; it manufactures it, by forcing the platforms to keep identifying as participants drivers they have judged unfit and thereby depriving Mr. McGrath of accurate information about whether a driver's presence under a mark reflects the platform's judgment or the City's compulsion. Compl. ¶¶41-48, 70; McGrath Decl. ¶¶19-20.

Under *Central Hudson*, a restriction on non-misleading commercial speech about lawful activity must directly advance a substantial government interest and be no more extensive than necessary. 447 U.S. at 566. Local Law 52 fails at each step. The City has no legitimate interest in making marketplace marks ***less*** informative to riders, and a regulation does not "directly advance" an interest unless it "alleviate[s]" the asserted harm "to a material degree"—something degrading the rider's information cannot do. *Edenfield v. Fane*, 507 U.S. 761, 771 (1993); Compl. ¶71. The City "must present more than anecdote and supposition" to justify burdening speech, *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 822 (2000), and the law is in any event far "more extensive than necessary": the City could protect drivers through neutral or expedited review, compensation or

16

severance, arbitration, targeted notice, protective-order procedures, or its own City-administered disclosures, none of which requires conscripting private marks to carry an altered signal. *Central Hudson*, 447 U.S. at 566; Compl. ¶¶50, 71.

That Local Law 52 regulates information at all brings it within the First Amendment; a New York City law compelling delivery platforms to share customer data was recently enjoined on exactly that ground. *See DoorDash, Inc. v. City of New York*, 789 F. Supp. 3d 337, 353 (S.D.N.Y. 2025) (Torres, *J.*). Finally, the City cannot escape review by labeling the statute a regulation of "conduct": a law that restricts expression based on its message is content based regardless of the label, *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (stating that any governmental restrictions on speech based on its "communicative content" are "presumptively unconstitutional" and subject to strict scrutiny).  And the Supreme Court reaffirmed this Term that a content regulation does not escape scrutiny by recasting itself as a regulation of professional conduct, *Chiles v. Salazar*, No. 24-539, slip op. at *16 (U.S. Mar. 31, 2026).[3] Plaintiff is likely to succeed on Claim One.

## II. Claim Two: Local Law 52 Compels a Material Alteration of Private Marks and Affiliation Speech

Trademarks and service marks are private speech. *Matal v. Tam*, 582 U.S. 218, 239 (2017); *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). A mark identifies and distinguishes the source of goods or services and communicates source, affiliation, reputation, quality, and standards. *See Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 146 (2023); *USPTO v. Booking.com B.V.*, 591 U.S. 549, 552-53 (2020).

---

[3] https://www.supremecourt.gov/opinions/25pdf/24-539_fd9g.pdf

17

In the ride-hailing context, the platform mark communicates that the driver has been admitted to, remains authorized by, and is subject to the standards of a private marketplace. Compl. ¶¶21-32, 73; McGrath Decl. ¶6.

The First Amendment forbids the government from compelling a private party to carry a message it would not, or from materially altering the content of private expression. "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech," and so is treated as a content-based burden. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). That protection extends to a private actor's editorial and associational judgments about whom to include and what its expression will say, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572-73 (1995), including a platform's curation of who and what appears under its name, *Moody v. NetChoice, LLC*, 603 U.S. 707, 731-33 (2024); *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). And the protection runs to the listener: where the government compels or alters private speech, the audience that relies on it has a reciprocal First Amendment interest in receiving it uncoerced. *See Va. State Bd. of Pharmacy*, 425 U.S. at 756-57.

Local Law 52 compels a materially altered affiliation message. By forbidding deactivation except on the City's terms, mandating advance notice, commanding reinstatement of prior deactivations, placing the burden on the service, and ordering restoration as a remedy, N.Y.C. Admin. Code §§ 20-1282(a), (d), 20-1283(a), 20-1285(a), 20-1208(c)(1), 20-1211(c), the law forces covered services to keep presenting drivers under their marks when the services would disassociate

18

from them. Compl. ¶74. The message Mr. McGrath receives ceases to be "this driver operates under this platform's standards" and becomes "this driver operates under this platform's mark, though the City may have blocked his removal." Compl. ¶75; McGrath Decl. ¶¶18-19, 23. That compulsion to keep an unwanted driver under the mark also implicates the platforms' freedom of expressive association, the burdening of which further distorts the signal Mr. McGrath receives. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *Slattery v. Hochul*, 61 F.4th 278, 287-88 (2d Cir. 2023).

The compulsion is content based and speaker based: it singles out two identified marketplaces and changes the content of their affiliation speech to serve a government-preferred retention policy. Compl. ¶¶34, 75. It therefore triggers strict scrutiny, *see Sorrell*, 564 U.S. at 565, which it cannot survive: the City has no compelling interest in diluting private marks or forcing Mr. McGrath to receive a government-altered affiliation message, and the law is not narrowly tailored—it sweeps across safety, quality, fraud, professionalism, and service standards and reaches back seven years. Compl. ¶75; McGrath Decl. ¶¶13, 17. A law that "single[s] out" particular speakers for "disfavored treatment" raises "serious doubts about whether the government is in fact pursuing the interest it invokes," *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011), and Local Law 52 burdens the marks of exactly two named companies, Compl. ¶34. Nor can the law be saved as a permissible compelled factual disclosure: such disclosures are tolerated only when they require "purely factual and uncontroversial information" and are neither "unjustified [n]or unduly burdensome," *Zauderer v. Off. of Disciplinary Couns.*, 471

19

U.S. 626, 651 (1985), and Local Law 52 compels no disclosure at all.  Rather, it compels continued affiliation and changes the mark's meaning, Compl. ¶75. The law fails strict scrutiny, and it fails even the intermediate scrutiny applicable to commercial speech. Plaintiff is likely to succeed on Claim Two.

### III. Claim Three: Local Law 52 Chills Rider Ratings, Comments, and Confidential Speech

Rider ratings, comments, and complaints are protected speech. They express a rider's views on safety, professionalism, discrimination, harassment, vehicle condition, and routing—matters of obvious concern to the marketplace and to public safety. Compl. ¶¶56, 77; McGrath Decl. ¶26. The First Amendment protects the right to deliver that speech without compelled exposure to the person criticized. The Supreme Court has long recognized that compelled disclosure of a speaker's identity or associations can "constitute as effective a restraint on freedom of association [and speech] as [other] forms of governmental action," *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958), and that "[a]n author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995); *see also id.* at 352 ("It applies no matter what the character or strength of the author's interest in anonymity.") A compelled-disclosure regime that exposes speakers to identification, harassment, or retaliation must withstand exacting scrutiny and be narrowly tailored to a sufficiently important governmental interest. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607-11 (2021).

20

Section 20-1286(a)(2) compels covered services to disclose to a deactivated driver "[a]ll customer comments, ratings, and complaints" about him, and the statute's lone safeguard—redaction of "personally identifiable information," § 20-1286(b)—does not reach the contextual detail that identifies a rider in the intimate setting of a private car. N.Y.C. Admin. Code § 20-1286(a)(2), (b); Compl. ¶40. As Mr. McGrath explains, a complaint about a one-on-one ride is full of details (including the date and time, the pickup and drop-off points, the route, the workplace, and the specific thing that happened) that would let a driver identify who complained even with a name removed; indeed, the name is the least of it. Compl. ¶57; McGrath Decl. ¶28. The mandate predictably chills Mr. McGrath's intended feedback, most severely for reports of harassment (including sexual harassment), threats, intimidation, unsafe driving, or a driver who was hostile or lost his temper— precisely where candor matters most. Compl. ¶59; McGrath Decl. ¶¶29, 31. That a compelled-disclosure regime predictably deters protected reporting is a cognizable First Amendment harm.

This Court's recent decision in *DoorDash* confirms the point. There, a New York City law that compelled delivery platforms to hand over customer data was enjoined because the First Amendment protects a platform's "discretion over 'who (if anyone) will receive customer data,'" and because a compelled disclosure not made "to the general public" does not serve the public-information interest that might otherwise justify it under *Zauderer*. *DoorDash, Inc. v. City of New York*, 789 F. Supp. 3d 337, 353, 355 (S.D.N.Y. 2025). Section 20-1286(a)(2) is materially worse from the speaker's standpoint: it routes the rider's own words not to the general

21

public but to the single person—the deactivated driver—most likely to resent them and best positioned to identify their author. The provision flunks exacting scrutiny because it is not narrowly tailored: the City could protect fair review of deactivations through neutral in camera review, protective orders, redacted summaries, counsel-only disclosure, disclosure to a neutral fact finder rather than the driver personally, or a safe harbor for truthful or good-faith complaints. Compl. ¶¶59, 79. Plaintiff is likely to succeed on Claim Three.

## IV. Claim Four: Local Law 52 Creates a Credible Threat of Civil Liability Against Riders Under the "No Person" Provision

Claim Four challenges the combined operation of three provisions: the "[n]o person" anti-retaliation command of § 20-1204(a), the private cause of action in § 20-1211, and the compelled disclosure of rider complaints in § 20-1286(a)(2). On its face, § 20-1204(a) provides that "[n]o person" may take adverse action—including "threatening, intimidating, . . . or harassing"—against a covered driver that penalizes or is reasonably likely to deter the driver's exercise of rights under Chapter 12; the phrase "[n]o person" is not limited to platforms, employers, bases, or agents—terms the law uses elsewhere—and contains no exception for riders, customers, or those who submit ratings or complaints. N.Y.C. Admin. Code § 20-1204(a); Compl. ¶¶58, 81. Section 20-1211(a)(1) makes the prohibition privately enforceable by "[a]ny person, including any organization," and authorizes compensatory, injunctive, and declaratory relief plus fees and costs, while § 20-1286(a)(2) hands the driver the rider's own words. N.Y.C. Admin. Code §§ 20-1211(a)(1), (b), 20-1286(a)(2); Compl. ¶¶81-82.

22

That combination creates a credible First Amendment threat. A driver who receives Mr. McGrath's truthful complaint may assert that it was an "adverse action," constituted harassment or intimidation, or was reasonably likely to deter his exercise of statutory rights, and may identify, accuse, subpoena, or sue him. Compl. ¶82; McGrath Decl. ¶30. The injury is not confined to ultimate liability; it includes the objectively reasonable prospect of identification, subpoena, litigation cost, and retaliatory process arising from protected speech, and the resulting "self-censorship." *Am. Booksellers*, 484 U.S. at 393 ("the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution").

Mr. McGrath need not show that any such claim would ultimately succeed to establish a present, chilling injury; the prospect of being dragged into such a dispute is itself enough to make him hesitate. Compl. ¶82; McGrath Decl. ¶¶30-31. The Supreme Court's decision in *First Choice* confirms that the threat of compelled disclosure and resulting exposure can itself ripen into a present First Amendment injury. *First Choice*, No. 24-781, slip op. (U.S. Apr. 29, 2026).[4]

The provision is not narrowly tailored as applied to rider speech. The City can shield drivers from platform retaliation without exposing riders to liability for truthful safety and quality complaints—by limiting § 20-1204(a) to platforms, employers, and their agents, exempting rider feedback, creating a safe harbor for good-faith complaints, or requiring proof of knowing falsity before any rider faces

---

[4] https://www.supremecourt.gov/opinions/25pdf/24-781_pok0.pdf

23

liability. Compl. ¶83. By choosing "[n]o person" language that reaches riders and pairing it with private enforcement and compelled disclosure, Local Law 52 chills Mr. McGrath's protected speech. Compl. ¶¶82-83; McGrath Decl. ¶31. Plaintiff is likely to succeed on Claim Four.

### V. Claim Five: Plaintiff May Assert the First Amendment Rights of Conscientious Drivers, Who Are Likewise Injured

A platform mark is the driver's speech as well as the rider's. A driver who satisfies a platform's standards uses the mark to tell riders that he has done so: to appear under the UBER mark is to say "I am an Uber driver," meaning a driver Uber presently authorizes under its standards. Compl. ¶85; *see Matal*, 582 U.S. at 235. By forcing the mark to remain attached to drivers the platform would remove, Local Law 52 distorts and dilutes the conscientious driver's own affiliation message, draining it of the meaning that made it worth sending and impairing his ability to distinguish himself from drivers who do not meet the same standards. Compl. ¶¶49, 85.

Mr. McGrath may assert that injury. He satisfies Article III in his own right—he has alleged a concrete, particularized injury fairly traceable to Local Law 52 and redressable by the relief he seeks—so his assertion of the drivers' rights is additional to, not a substitute for, his own standing. Compl. ¶86; McGrath Decl. ¶¶20, 32-33. He also satisfies the requirements for third-party standing: a litigant who has suffered his own injury may assert a third party's rights where he has a "close" relationship with that party and there is some "hindrance" to the third party's ability to protect its own interests. *Kowalski v. Tesmer*, 543 U.S. 125, 130

24

(2004). The rider and the driver who serves him are the two parties to the marketplace conversation the mark mediates; the rider is the intended recipient of the driver's affiliation message and relies on it in choosing a ride. Compl. ¶87; McGrath Decl. ¶¶5-6. Conscientious drivers also face genuine obstacles to suit: the dilution harm is diffuse and difficult to monetize, creating a collective-action barrier; a driver who challenged a measure cast as worker protection would risk platform discipline and peer retaliation; and the drivers with the clearest incentive to litigate—those who were deactivated—hold interests opposed to the mark-integrity claim. Compl. ¶88. Finally, the First Amendment context relaxes prudential limits on third-party standing, permitting a litigant who has suffered his own injury to argue that a law unconstitutionally burdens the protected expression of others. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956-59 (1984) ("when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged"); *Va. v. Am. Booksellers Ass'n*, 484 U.S. at 392-93. Plaintiff is likely to succeed on Claim Five.

### VI. Irreparable Harm, the Balance of Equities, and the Public Interest All Favor an Injunction on Every Claim

Because Mr. McGrath is likely to succeed on his First Amendment claims, irreparable harm is established as a matter of law. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod*, 427 U.S. at 373, and in this Circuit "no further showing of irreparable injury is necessary" once a deprivation of a constitutional right is

25

shown, *Bery*, 97 F.3d at 694; *Statharos*, 198 F.3d at 322. Mr. McGrath need show only "a threat of irreparable harm," *Mullins*, 626 F.3d at 55, and the imminent, not-yet-effective operation of Local Law 52 supplies it, *Airbnb, Inc.*, 373 F. Supp. 3d at 498. The harm is concrete: from the law's first day, Mr. McGrath will receive degraded marketplace information at the point of choosing a ride, unable to tell whether a driver under a covered mark is there by the platform's choice or the City's command, and he will simultaneously be chilled from candid reporting by the foreseeable disclosure of his words and the credible threat of suit. Compl. ¶¶64-66; McGrath Decl. ¶¶19-20, 30-31, 33.

Money damages cannot remedy that harm. The injury is the ongoing loss of First Amendment-protected information, the ongoing distortion of private marks in a marketplace Mr. McGrath uses, and the chilling of rider complaints that depend on confidentiality—none of which is compensable in damages, and as to which the City would in any event likely enjoy immunity defenses. Compl. ¶66; McGrath Decl. ¶32. Nor is the injury a one-time event; it repeats each time Mr. McGrath opens the app, on every ride he takes after July 28, 2026. McGrath Decl. ¶33.

The balance of equities and the public interest—which merge where the Government is the defendant, *Nken*, 556 U.S. at 435; *725 Eatery Corp.*, 408 F. Supp. 3d at 469—decisively favor relief. The City "does not have an interest in the enforcement of an unconstitutional law," *id.* at 470, and "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal," *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020). An injunction imposes no cognizable hardship on the City: the

26

law has not yet taken effect, so an injunction merely preserves the status quo, and the City remains free to protect drivers through the many constitutional alternatives identified above. Compl. ¶¶50, 71. The public interest is affirmatively served by "the correction" of these constitutional harms, *A.H. v. French*, 985 F.3d at 184, and by preserving accurate marketplace signals and protecting riders who report unsafe, threatening, harassing, or discriminatory conduct from exposure to the very drivers they report. Compl. ¶66; McGrath Decl. ¶¶26, 33. Because "securing First Amendment rights is in the public interest," *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), each of Plaintiff's claims independently warrants a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant his motion and enter a preliminary injunction enjoining Defendant the City of New York, its officers, agents, employees, agencies, and all persons acting in concert with them from implementing or enforcing Local Law 52, including N.Y.C. Administrative Code §§ 20-1204, 20-1211, and 20-1281 through 20-1290, to the extent necessary to remedy the First Amendment injuries alleged in the Complaint and established by the McGrath Declaration; staying and restraining the law's July 28, 2026 effective date pending final judgment on the merits; and granting such other and further relief as the Court deems just and proper.

Dated: June 28, 2026
Long Island City, New York

KASELL LAW FIRM

By: /s/ *David Kasell*
David Kasell, Esq.
*Attorney for Plaintiff Robert McGrath*
1038 Jackson Avenue, Suite #4
Long Island City, New York 11101
Office: (718) 404-6668
Email: david@kaselllawfirm.com

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ROBERT MCGRATH,

       *Plaintiff,*

      – against –

CITY OF NEW YORK,

       *Defendant.*
-------------------------------------------------------------------X

26 Civ. 5466

**CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1(c)**

Pursuant to Rule 7.1(c) of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, the undersigned counsel for Plaintiff Robert McGrath hereby certifies that the foregoing Memorandum of Law in Support of Plaintiff's Motion for a Preliminary Injunction complies with the word-count limitation set forth in Local Civil Rule 7.1(c).

As measured by the word-count function of the word-processing program used to prepare it, the Memorandum of Law contains 7,425 words, exclusive of the caption, table of contents, table of authorities, and signature block. The Memorandum therefore does not exceed the 8,750-word limit prescribed by Local Civil Rule 7.1(c).

Dated: June 28, 2026
      Long Island City, New York

By: /s/ *David Kasell*
David Kasell, Esq.
*Attorney for Plaintiff Robert McGrath*
1038 Jackson Avenue, Suite #4
Long Island City, New York 11101