UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
ROBERT MCGRATH,

      *Plaintiff,*

      – against –

CITY OF NEW YORK,

      *Defendant.*
------------------------------------------------------------------------X

26 Civ. 5466

## DECLARATION OF ROBERT MCGRATH IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

I, Robert McGrath, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct based on my own personal knowledge:

### I. Background

1. I am the plaintiff in this action. I submit this declaration in support of my motion for a preliminary injunction enjoining the enforcement of Local Law 52 of 2026, which I understand will take effect on July 28, 2026. I am over eighteen years old and competent to make this declaration.

2. I live in Brooklyn, New York. I work at a luxury hospitality property in Midtown Manhattan, where my position regularly requires me to work evenings, late nights until 2 a.m., weekends, and holidays. Because of my schedule, I frequently begin or end work at hours when the subway feels neither safe nor practical, and I rely on app-based for-hire vehicles to get to and from work.

3. I am a frequent rider. In a typical week I take somewhere between three to five app-based for-hire rides. Many of those rides happen late at night or in

1

Doc ID: 444fc572533b9b2bba19b6baa983856e3b5ee83d

the early morning. Many of them are rides I take alone. And many of them run between my home in Brooklyn and my workplace in Midtown, which means that the drivers I ride with easily learn where I work, the approximate hours I keep, and the street where I live.

4.    I use app-based for-hire services by choice and out of necessity. As a hospitality worker, I am aware of what good service looks like, and I pay close attention to the experience of being a customer. I notice how I am treated in a vehicle the same way I notice how a guest is treated at my workplace.

## II. How I Choose a Ride, and Why the Platform's Name Matters to Me

5.    When I open a ride-hailing app and choose "Uber," "Lyft," or another service, I am not simply hailing the nearest car. I am choosing a particular company, brand, and marketplace. The name and mark of that company communicate something specific and important to me before I ever get in the car.

6.    To me, the Uber name on my screen means that the driver pulling up has been admitted into Uber's marketplace, has been screened by Uber, is subject to Uber's rules and rating system, and remains someone Uber is presently willing to stand behind. Most importantly, it tells me that if this driver behaves badly, I can report it to Uber, and that Uber has both the ability and the incentive to remove a driver who does not meet its standards. The mark is, in effect, a promise about who is allowed to keep operating under that name.

7.    I rely on that promise because I have no other practical way to evaluate a driver before I get in the car. I am often making the decision on a phone, standing on a sidewalk, late at night, sometimes in bad weather, sometimes tired

2

Doc ID: 444fc572533b9b2bba19b6baa983856e3b5ee83d

after a long shift. I cannot investigate a stranger's driving record, complaint history, or temperament before the car arrives. I rely on the platform's name and the company's reputation as a compact shorthand for all of the screening and monitoring I cannot do myself.

8.      I also actively compare services. I compare prices between services, and I pay attention to what each marketplace is known for. I talk with friends and other people about their experiences with various services.  For example, I recently looked into Empower, which advertises that it is roughly thirty percent cheaper than Uber and Lyft. But when I asked people I know about their experiences with Empower, several told me, in substance, that Empower is where a lot of drivers go after they get kicked off Uber. That single piece of information changed how I understood the Empower name. It told me that a lower price can come with a marketplace that exercises less control over who drives under its name and that the quality of service and the ride might be substantially less (which, in fact, turned out to be true three out of the six times I used Empower).

9.      I value being able to make that trade-off myself. There are nights when I am willing to pay less and accept a service with a weaker reputation for quality. There are other nights (especially when I am alone, when it is very late, or when I simply want to feel safe and comfortable) when I will pay more for a marketplace whose mark tells me it screens carefully and removes drivers who fall short. The whole point is that the different marks mean different things, and I choose among them based on those differences.

3

### III. The Power to Remove Drivers Is What Keeps the Everyday Experience in Line

10.    In my experience, the single most important thing a platform's mark communicates is not just that a driver was screened once, at the beginning, but that the platform can and will remove a driver who turns out to be a problem or otherwise falls below their standards. That ongoing power to deactivate is what gives the mark its value to me.

11.    I have come to understand, as a frequent rider, that a driver's good behavior is not guaranteed by a license. It is held in place, day to day, by the knowledge that bad behavior has consequences—that a pattern of complaints, a falling rating, or a serious incident can cost the driver access to the platform. The credible possibility of removal is a constant, quiet form of constraint, and I believe it is a large part of why the overwhelming majority of my rides are professional and uneventful as opposed to the rides in the past with street-hailed taxis.

12.    The conduct I care about most as a rider is usually not criminal o or even egregious conduct. It is the broad middle band of behavior that makes a ride either comfortable or unpleasant, safe-feeling or unsettling. I am talking about whether the driver is courteous or rude; whether the car is clean or dirty; whether it smells of food or other odors; whether the driver is paying attention to the road or to his phone; whether he drives calmly or aggressively; whether he keeps appropriate boundaries or makes me uncomfortable with personal questions, comments about my appearance, or unwanted conversation; whether he loses his temper when traffic is bad; and whether he respects basic requests, like the route I prefer, the

4

Doc ID: 444fc572533b9b2bba19b6baa983856e3b5ee83d

temperature in the car, changing the music, or not talking with other people on the phone.

13. Today, I rely on the platform's mark to tell me that this kind of low-level but important misconduct is being policed—that drivers who repeatedly eat full meals in the car, who play loud music or take speakerphone calls for the entire ride, who drive while distracted, who are short-tempered or hostile, who pressure riders for cash tips, or who make riders uneasy with inappropriate comments, will eventually accumulate complaints and lose access. The mark is my assurance that these red flags carry consequences.

14. My concern about Local Law 52 is that, by stripping the covered platforms of their ability to remove drivers except on the City's narrow terms (and only after progressive discipline, advance notice, and a proceeding in which the company bears the burden of proof) the law removes the very incentive that keeps this everyday behavior in check. I expect that, over time, the practical consequence will be a decline of the ordinary courtesy and quality of the ride care I currently count on and seek when I asked for a driver.

15. I anticipate, and I am worried about, exactly the kind of low-level problematic behavior that today usually stays in check: more drivers eating in the car, more dirty or foul-smelling vehicles, more drivers glued to their phones, more irritability and short tempers, more borderline or inappropriate comments, more pressure for tips, more drivers ignoring reasonable requests such as turning off the music, and more small acts of hostility or carelessness. Individually, none of these is a crime or egregious conduct. But each one degrades the ride, and together they are

5

Doc ID: 444fc572533b9b2bba19b6baa983856e3b5ee83d

exactly the kind of conduct that a platform with real removal authority can deter and that a platform stripped of that authority cannot.

16.    This concerns me most because of how I ride. When I am alone in a stranger's car at one or two in the morning, a driver who is angry, who has poor impulse control, or who does not respect boundaries is not a minor annoyance—he is frightening. The thing that reassures me today is my belief that such a driver will not last long on a platform whose mark I trust, because riders like me can report him and the platform can act. Local Law 52 takes that reassurance away precisely in the zone of conduct—short of egregious, imminent danger—where I, as an everyday rider, actually live.

17.    I also understand that under Local Law 52 the covered platforms may be required to bring back drivers they previously removed, including drivers deactivated years ago. That troubles me. If a driver was taken off a platform because of how he treated riders, the platform's mark used to tell me he was gone. Under this law, that same driver may be back under the same mark, and I will have no way to know it.

### IV. How Local Law 52 Changes What the Mark Says to Me

18.    Because of all this, Local Law 52 changes the meaning of the platform's mark for me. Before the law, when I see "Uber" or "Lyft," the name tells me the driver is there because the company presently chooses to let him operate under its name and standards. After the law, the same name will no longer reliably tell me that. The driver may be there because the company chose him, or he may be

Doc ID: 444fc572533b9b2bba19b6baa983856e3b5ee83d

there because the City prevented, delayed, or reversed the company's decision to remove him.

19.   That difference matters to me. Whether a driver is in the car because the company stands behind him, or because the law forced the company to keep him, is exactly the information I use the mark to learn. Local Law 52 erases that information while leaving the word on my screen looking identical. The name will look the same, but it will mean less, and I will have no way to tell the difference at the moment I have to decide whether to get in the car.

20.   The result is that I will receive less accurate and less trustworthy information at the precise moment I most need it. I will face more uncertainty about driver quality, and I will have to choose among riding on a degraded signal, paying more or waiting longer for an alternative I trust, or simply not taking a ride I otherwise would have taken.

## V. The Loss of My Ability to Choose Among Different Marketplaces

21.   Different platforms have different standards, different reputations, and different approaches to safety and service. Part of what I am buying when I choose one mark over another is that company's particular judgment about who is good enough to drive under its name. I want to be able to choose among driving associated with those companies on that basis.

22.   By forcing the two covered platforms to keep drivers they would otherwise remove, Local Law 52 flattens those differences. It makes it harder for a company to distinguish itself through stricter standards and more decisive enforcement, because the law prevents it from acting on those standards. That

Doc ID: 444fc572533b9b2bba19b6baa983856e3b5ee83d

harms me, because the differences among marketplaces are exactly the information I rely on when I decide which service to use.

23.    The law also creates confusion that did not exist before. If a platform keeps displaying its mark while the City prevents it from removing drivers it would otherwise remove, I cannot tell whether the marketplace I am entering reflects the company's real standards or the City's compelled-inclusion rules. The mark stops being a clean signal and becomes an ambiguous one.

### VI. The Mark Does Not Stop at the City Line, but the Law Does

24.    I travel outside the five boroughs of New York City, and like most people I carry a single understanding of what "Uber" or "Lyft" means wherever I use it. The app looks the same in Manhattan as in another city or place such as New Jersey where I have used Uber. There is nothing on my screen that tells me the company's power over its own drivers is different inside the five boroughs than it is everywhere else.

25.    Under Local Law 52, though, the same national name will mean one thing outside New York City and a different, weaker thing inside the City. I will be relying on a uniform mark that the City has hollowed out for New York alone.

### VII. The Law Will Make Me Afraid to Report Misconduct

26.    As a frequent rider, my ability to report bad behavior is one of the most important protections I have. When a driver does something unsafe, hostile, harassing, or otherwise wrong, I want to be able to tell the platform about it so the platform can act, including by removing the driver if it concludes that is warranted.

8

27.     To report honestly, I need to be able to do so without being exposed or identified to the driver. This matters enormously to me because of how much a driver already knows about me. A driver who has picked me up at home or dropped me at work knows where I live, where I work, the hours I keep, and the routes I travel. The idea that my complaint (and details that could identify me) might be handed to that same driver is deeply unsettling.

28.     I understand that Local Law 52 requires the covered platforms, when they deactivate a driver, to turn over to that driver all of the customer comments, ratings, and complaints about him, and that the only protection the law requires is the removal of a passenger's name and obvious identifying information. In my experience, that protection is not nearly enough. A complaint about a one-on-one ride is full of details (the date and time, where I was picked up and dropped off, the route, my workplace, and the specific thing that happened) that would let a driver figure out exactly who complained even if my name were removed.  Indeed, a driver knowing my name as opposed to those other details would be the least of concern.

29.     If I have a serious complaint about harassment, including sexual harassment, about threatening or intimidating behavior, about unsafe driving, or about a driver who lost his temper with me or was rude and unprofessional, I would be genuinely afraid that complaining could lead to my being identified and to retaliation or unwanted contact from the very person I reported. That fear is strongest in exactly the situations where reporting matters most.

30.     I am also aware that Local Law 52 contains a provision saying that "no person" may take action against a driver that could be seen as penalizing or

9

Doc ID: 444fc572533b9b2bba19b6baa983856e3b5ee83d

deterring the driver from exercising his rights, and that this provision can be enforced by a private lawsuit. As I read it, that language is broad enough to reach an ordinary rider like me. I am worried that a driver I reported could turn around and accuse me of harassment, intimidation, or retaliation, and could try to identify me, subpoena me, or sue me, simply for filing a truthful complaint. Even if I would ultimately win such a dispute, the prospect of being dragged into it (named, identified, and forced to defend myself) is itself enough to make me hesitate.

31.     The honest result is that I will censor myself. I will be less willing to file the candid, detailed complaints I currently file, especially about the serious conduct that I most want platforms to know about. I do not want to trade my safety and privacy for the ability to report a driver, and Local Law 52 puts me in exactly that position.

## VIII. This Harm Cannot Be Undone with Money

32.     The injuries I have described are not the kind that money can repair. My harm is the ongoing loss of accurate, trustworthy speech and information at the moment I choose a ride; the ongoing distortion of what the platform marks mean in a marketplace I use constantly; and the chilling of complaints that depend on confidentiality and on the platform's freedom to act. No damages award would give me back the accurate signal or restore my willingness to speak.

33.     And this is not a one-time injury. It repeats every single time I open the app. Each ride I take after July 28, 2026, I will face the same degraded information, the same uncertainty about whether a driver is there by the company's choice or the City's command, and the same reluctance to report what I see. A

10

Doc ID: 444fc572533b9b2bba19b6baa983856e3b5ee83d

preliminary injunction would protect me by preserving, while this case is decided, the ability of the platforms to communicate honestly through their marks and to police the drivers who operate under them.

34.    For these reasons, I respectfully ask the Court to grant my motion for a preliminary injunction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 28, 2026, in New York, New York.

_____
ROBERT MCGRATH

11

Doc ID: 444fc572533b9b2bba19b6baa983856e3b5ee83d