Index No. 26-CV-05466

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT MCGRATH,

Plaintiff,

-against-

CITY OF NEW YORK,

Defendant.

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

*STEVEN BANKS*
*Corporation Counsel of the City of New York*
*Attorney for Defendant*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Taylor Anvid*
*Tel:  (212) 356-2196*
*Matter No.  2026-051287*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... III

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 2

    A.  The Wrongful Deactivation of Drivers and the Enactment of LL52 .................................................................... 4

    B.  Local Law 52 of 2026 ............................................................ 7

    C.  Uber and Lyft Disclose Rider Information .......................... 9

STANDARD OF REVIEW ........................................................................................ 10

ARGUMENT

    POINT I

        PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS ......................................................... 10

        A.  PLAINTIFF LACKS STANDING ................................... 10

            1.  Plaintiff Does Not Sufficiently Allege An "Injury-In-Fact" .................................................. 11

        B.  PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED PURSUANT TO THE EQUITABLE DOCTRINE OF LACHES ....................................... 14

        C.  LL52 DOES NOT IMPERMISSIBLY COMPEL PLAINTIFF'S SPEECH ............................................. 17

            1.  The Notice and Data Sharing Provisions Regulate Conduct, Not Speech ....................... 18

                i.  LL52 Implicates At Most Commercial Speech .................................................. 20

                    a.  LL52 is Subject to, and Satisfies, Rational Basis Review under *Zauderer* .............................. 21

**Page**

b.   The Challenged Provisions Satisfy Intermediate Scrutiny ....................................................... 23

ii.   Strict Scrutiny Does Not Apply ............................................. 24

D.  LL52 DOES NOT IMPERMISSIBLY COMPEL EXPRESSIVE ASSOCIATION ..................................................... 25

POINT II

PLAINTIFF CANNOT ESTABLISH IRREPARABLE HARM ....................................................................................... 27

POINT III

THE BALANCE OF THE EQUITIES TIPS STRONGLY IN THE CITY'S FAVOR ................................................................. 28

CONCLUSION ....................................................................................... 29

WORD COUNT CERTIFICATION ......................................................... 30

## TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*Ams. For Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021)...................................................................................................13

*Arcara v. Cloud Books, Inc.*,
    478 U.S. 697 (1986)...................................................................................................19

*Bd. of Trs. v. Fox*,
    492 U.S. 469 (1989)...................................................................................................20

*Boy Scouts of America v. Dale*,
    530 U.S. 640 (2000)............................................................................................... 25-26

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
    477 U.S. 557 (1980)...............................................................12, 20, 21, 23, 25

*Compasscare v. Hochul*,
    125 F.4th 49 (2d Cir. 2025) .....................................................................20, 21, 23, 25

*Cornelio v. Rosado*,
    24-cv-01335, 2025 U.S. Dist. LEXIS 191250
    (N.D.N.Y. Sept. 29, 2025) .........................................................................................19

*Council for Responsible Nutrition v. James*,
    159 F.4th 155 (2d Cir. 2025) ....................................................................................18

*Curley v. Village of Suffern*,
    268 F.3d 65 (2d Cir. 2001)........................................................................................13

*Doordash, Inc. v. City of New York*,
    25-cv-10268, 2026 U.S. Dist. LEXIS 12619
    (S.D.N.Y. Jan. 22, 2026)......................................................................................21, 29

*Doordash, Inc. v. New York City Dep't of Consumer & Worker Protect.*,
    Index. No. 155947/2023, 2023 N.Y. Misc. LEXIS 6071
    (Sup. Ct. New York Cnty. Sept. 27, 2023) ..............................................................28

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009).....................................................................................27

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949)...................................................................................................18

*Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist. No. 3*,
    85 F.3d 839 (2d Cir. 1996)........................................................................................25

| Cases | Pages |
|---|---|

*Irish Lesbian and Gay Organization (ILGO) v. Giuliani*,
918 F. Supp. 732 (S.D.N.Y. 1996) ................................................................15, 16

*JC Hosp. v. Hochberg*,
703 F. Supp. 3d 448 (S.D.N.Y. 2023).................................................................11

*Knife Rights, Inc. v. Cyrus Vance, Jr.*,
802 F.3d 377 (2d Cir. 2015)...............................................................................11

*Lewis v. Thompson*,
252 F.3d 567 (2d Cir. 2001)................................................................................23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)............................................................................................13

*Lyft Inc. v. City of New York*,
25-cv-04931(GHW)...............................................................................................9

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)............................................................................................10

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958)............................................................................................13

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001)..........................................................................22, 23

*Nat'l Retail Fed. v. James*,
25-cv-5500, 2025 U.S. Dist. LEXIS 199836
(S.D.N.Y. Oct. 8, 2025) .....................................................................................22

*National Council of Arab Americans v. City of New York*,
331 F. Supp. 2d 258 (S.D.N.Y. 2004)................................................................15

*New York State Restaurant Ass'n v. New York City Bd. of Health*,
556 F.3d 131 (2d Cir. 2009)................................................................................25

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020).................................................................................27

*Nnebe v. Daus*,
931 F.3d 70 (2d Cir. 2019).................................................................................26

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978)............................................................................................20

**Cases**                                                                    **Pages**

*Powers v. Ohio*,
 499 U.S. 400 (1991)......................................................................................10, 11, 12

*Raines v. Byrd*,
 521 U.S. 811 (1997)..................................................................................................10

*Roberts v. United States Jaycees*,
 468 U.S. 609 (1984)..................................................................................................25

*Roman Catholic Diocese v. Cuomo*,
 592 U.S. 14 (2020)....................................................................................................10

*Rumsfeld v. FAIR*,
 547 U.S. 47 (2006)..............................................................................................18, 19

*Salinger v. Colting*,
 607 F.3d 68 (2d Cir. 2010)........................................................................................28

*Singas Famous Pizza Brands Corp. v. New York Advert. LLC*,
 10-Civ.-8976, 2011 U.S. Dist. LEXIS 14524
 (S.D.N.Y. Feb. 10, 2011) ..........................................................................................27

*Slattery v. Hochul*,
 61 F.4th 278 (2d Cir. 2023) ................................................................................20, 25

*Sorrell v. IMS Health Inc.*,
 564 U.S. 552 (2011)............................................................................................18, 25

*Stone v. Williams*,
 873 F.2d 620 (2d Cir.),
 *cert. denied*, 493 U.S. 959,
 *vacated on other grounds*,
 891 F.2d 401 (2d Cir. 1989)......................................................................................15

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149, 134 S. Ct. 2334 (2014)......................................................................11

*Tafuto v. Donald J. Trump for President, Inc.*,
 827 F. App'x 112 (2d Cir. 2020) ..............................................................................11

*Uber Technologies, Inc. and Uber USA, LLC v. City of New York*,
 26-cv-04893(GHW)....................................................................................................9

*Uber Techs., Inc. v. City of Seattle*,
 168 F.4th 1202
 (9th Cir. Mar. 4, 2026)....................................................................................19, 20, 22

| **Cases** | **Pages** |
|---|---|

*United States v. O'Brien*,
   391 U.S. 367 (1968)..................................................................................19

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Counsel*,
   425 U.S. 748 (1976)..............................................................................12, 22

*Vugo, Inc. v. City of New York*,
   931 F.3d 42 (2d Cir. 2019)....................................................................24, 25

*Warth v. Seldin*,
   422 U.S. 490 (1975)..................................................................................10

*Weinberger v. Romero-Bancelo*,
   456 U.S. 305 (1982)..................................................................................14

*Wheely USA, Inc. v. City of New York*,
   26-cv-091957, 2026 U.S. Dist. LEXIS 79548
   (S.D.N.Y. Apr. 10, 2026)................................................................18, 19, 20, 22

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..................................................................................10, 28

*WPIX v. League of Women Voters*,
   595 F. Supp. 1484 (S.D.N.Y. 1984)....................................................................15

*Yang v. Kosinski*,
   960 F.3d 119 (2d Cir. 2020)..........................................................................28

*Zauderer v. Off. of Disciplinary Couns.*,
   471 U.S. 626 (1985)..............................................................................21, 22, 23

**Statutes**

35 R.C.N.Y. § 68-15(a)(1) ..............................................................................26

Local Law 52 ..............................................1, 2, 3, 4, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 26, 27, 28

N.Y.C. Admin. Code § 20-1204(a)........................................................................14

N.Y.C. Admin. Code § 20-1211(a)(1) ....................................................................14

N.Y.C. Admin. Code § 20-1211(b)........................................................................14

N.Y.C. Admin. Code § 20-1281 ...........................................................................7

N.Y.C. Admin. Code § 20-1282 ...........................................................................7

**Statutes**                                                                                              **Pages**

N.Y.C. Admin. Code § 20-1282(a)................................................................................................7

N.Y.C. Admin. Code § 20-1282(b)(1)..........................................................................................7

N.Y.C. Admin. Code § 20-1282(b)(2)..........................................................................................8

N.Y.C. Admin. Code § 20-1282(b)(3)..........................................................................................8

N.Y.C. Admin. Code § 20-1282(b)(4)..........................................................................................8

N.Y.C. Admin. Code § 20-1282(b)(5)..........................................................................................8

N.Y.C. Admin. Code § 20-1282(b)(6)..........................................................................................8

N.Y.C. Admin. Code § 20-1282(b)(7)..........................................................................................7

N.Y.C. Admin. Code § 20-1282(c)................................................................................................7

N.Y.C. Admin. Code § 20-1282(d).................................................................................17, 25, 26

N.Y.C. Admin. Code § 20-1282(d)(i)...........................................................................................7

N.Y.C. Admin. Code § 20-1282(d)(ii)..........................................................................................7

N.Y.C. Admin. Code § 20-1282(d)(iii).........................................................................................7

N.Y.C. Case. Admin. Code § 20-1282(d)(iv)................................................................................7

N.Y.C. Admin. Code § 20-1282(e)..............................................................................................17

N.Y.C. Admin. Code § 20-1283 ...............................................................................................7, 8

N.Y.C. Admin. Code § 20-1283(a)...............................................................................................8

N.Y.C. Admin. Code § 20-1283(c)...............................................................................................8

N.Y.C. Admin. Code § 20-1284 ...................................................................................................7

N.Y.C. Admin. Code § 20-1285 ...............................................................................................7, 8

N.Y.C. Admin. Code § 20-1285(a)...............................................................................................8

N.Y.C. Admin. Code § 20-1285(b).........................................................................................8, 17

N.Y.C. Admin. Code § 20-1286 .......................................................................................7, 17, 25

N.Y.C. Admin. Code § 20-1286(a)...............................................................................................8

| **Cases** | **Pages** |
|---|---|

N.Y.C. Admin. Code § 20-1286(b).................................................................................8

N.Y.C. Admin. Code § 20-1286(c).................................................................................9

N.Y.C. Admin. Code § 20-1287 .....................................................................................7

N.Y.C. Admin. Code § 20-1288 .....................................................................................7

N.Y.C. Admin. Code § 20-1289 .....................................................................................7

N.Y.C. Admin. Code § 20-1290 .....................................................................................7

## PRELIMINARY STATEMENT

Local Law 52 of 2026 ("LL52") was adopted by the New York City Council ("Council") on January 29, 2026 to ensure for-hire vehicle ("FHV") drivers ("Drivers") are not wrongfully deactivated from high-volume FHV services ("Services"). In doing so, LL52 maintains rider safety while also shielding Drivers from arbitrary deactivations and potentially losing their livelihoods due to the capricious preferences of an individual rider or a Service platform error. LL52 regulates conduct between high-volume FHV service providers and their affiliated Drivers – not customers electing to use high-volume FHV services.

Plaintiff, who asserts that LL52 violates his First Amendment rights, purportedly declines to utilize public transportation or NYC Taxi services because he finds them to be inconvenient or unprofessional (Plaintiff Dec. ¶ ¶ 2 and 11). He alleges he chooses specifically to use Uber, Lyft, or "another service" because of their brand identity which allows him to make assumptions about Driver "quality" and how Driver "quality" standards are enforced by Services. (Plaintiff Dec. ¶ 20). Plaintiff asserts part of the reason he uses high-volume FHV services is because he likes knowing that "low-level but important conduct is being policed" and Drivers can be removed from a platform. (Plaintiff Dec. ¶ 13). In particular, Plaintiff highlights his concerns about whether or not a car is "clean" or "smells of food," or a Driver engages in "unwanted conversation" and adheres to Plaintiff's requests such as using his preferred route, vehicle temperature, or music. (Plaintiff Dec. ¶ 12).

Plaintiff has no claim here. As a threshold issue, Plaintiff lacks standing to challenge LL52, as Plaintiff has not, and cannot, show he has suffered an injury in fact or that such alleged injury is traceable to the conduct regulated between Services and Drivers by LL52. Nor can Plaintiff assert he has standing on behalf of Drivers to enjoin LL52 for the same reasons. Additionally, Plaintiff's application for a preliminary injunction should be denied pursuant to the

doctrine of laches. Plaintiff waited until the last minute to file this action, weeks after Uber and Lyft filed actions seeking a preliminary injunction of LL52, and days after the City filed its opposition to Uber's and Lyft's requests for injunctive relief. Plaintiff's timing of the instant application was uniquely, and unfairly, timed to maximize disruption of the City's defense in the ongoing Uber and Lyft cases, and just before LL52 is due to go into effect.

Finally, even if this Court believed Plaintiff's motion is not barred by his lack of standing or by the doctrine of laches, Plaintiff cannot satisfy the requirements for a preliminary injunction. First, his alleged claims fail on the merits and, thus, he cannot establish a likelihood of success. Plaintiff attempts to transform his concerns about Driver quality into First Amendment claims by invoking the Services' "private marks," and citing his alleged rights as a "listener." Yet, Plaintiff does not allege he is the holder or owner of any Service trademark, nor could he. Non-trademark owners, as part of the listening public generally, are only entitled to factually accurate advertising speech about the "mark" or content contained in a Service's advertisements, neither of which is implicated here. Stripped of his precarious trademark scaffold, Plaintiff's First Amendment claims crumble. Moreover, his claimed fears of chilled speech due to disclosure of rider data and civil liability stemming from LL52 are undercut by the plain language and context of LL52, as well as existing policies utilized by Uber and Lyft. Finally, Plaintiff cannot show irreparable harm, as any harm he has alleged is purely speculative, and the balance of the equities clearly favors the City and the Drivers whose livelihoods and well-being are jeopardized by wrongful deactivations from the Services' platforms. Therefore, Plaintiff's application for a preliminary injunction should be denied.

## STATEMENT OF FACTS

In January 2026, the Council adopted Local Law 52 of 2026 to create new protections for high-volume for-hire vehicle Drivers – the drivers who transport riders on trips

2

dispatched through the app-based platforms of high-volume FHV Services – against wrongful deactivation from those platforms.

Council introduced Int. 1078 of 2023, and its successor, Int. 276 of 2024, to limit the wrongful deactivation of Drivers.[1] To that end, Int. 276 prohibited Services from deactivating Drivers without just cause, legal reason, or a bona fide economic reason. The bill created an informal resolution process for deactivated drivers to contest their deactivation.[2] It also set forth notice and progressive discipline requirements that Services had to satisfy prior to deactivation, and provided appropriate exceptions to those requirements in the interest of protecting public safety.[3] On December 18, 2025, after engagement with Drivers, Services, and other stakeholders, Council introduced an amended version of the bill, Int. 276-A, and passed the bill that same day.[4] On January 29, 2026, Int. 276-A became Local Law 52 of 2026 after Council overrode Mayor Eric Adams' veto.[5]

Drivers who are deactivated without warning face the financial harm that comes with sudden and immediate loss of income. At the same time, Council recognized the need for Services to utilize immediate deactivations in certain circumstances. To that end, LL52 has appropriate carveouts to ensure that Services maintain the ability to immediately deactivate Drivers to protect public safety, combat fraud, and comply with legal requirements. Prior to enacting LL52, Council carefully considered ample evidence, including oral and written testimony from Services.

---

[1] *See* Declaration of Taylor Anvid, dated July 17, 2026 ("Anvid Decl."), Exs. B, C. All exhibits referenced herein are annexed to the Anvid Decl.

[2] Ex. C.

[3] *Id.*

[4] Ex. G.

[5] Ex. M.

3

**A.  The Wrongful Deactivation of Drivers and the Enactment of LL52**

In 2023, increasing reports were circulating in the media of riders submitting false complaints to Services about Drivers.[6] Riders submitted false reports to take advantage of Services' refund policies.  Even worse, some riders were lodging complaints against Drivers based on discriminatory animus.[7] Drivers expressed numerous concerns to Council about being wrongfully and arbitrarily deactivated from platforms because of these false complaints.[8]

On September 27, 2024, December 18, 2025, and January 28, 2026, Council's Committee on Transportation and Infrastructure ("Committee") issued reports regarding Int. 276 and Int. 276-A.[9] The Committee Reports detailed the Committee's consideration of several important studies. This included a February 2023 survey of Drivers in California conducted by the Asian Law Caucus,[10] which reported that two out of every three Drivers experienced discrimination, sexual harassment, or other forms of misconduct or customer bias while driving for Services.[11] Half of the Drivers who faced racial discrimination from a customer were also reported *by* that customer.[12]

Council also heard testimony from Drivers who detailed their personal experiences with wrongful deactivation, including deactivations after complaints from riders who were upset that Drivers would not make additional unplanned stops, would not violate traffic laws, and riders who lodged false accusations that the Driver was under the influence.[13]  One Driver testified that

---

[6] *See* Ex. H, pp.7-9; Ex. L, pp.6-9.

[7] *Id*.

[8]  *Id*.

[9] *See* Exs. D, H, L.

[10] Ex. H, pp.8-9; Ex. L, p.7.

[11] *Id.*

[12] *Id.*

[13] Ex. E, *see generally.*

she received a complaint from a rider after being verbally and physically assaulted by that rider.[14]

Several Drivers testified that, to this day, they still do not know the reason for their deactivation.[15]

Council considered the phenomenon of riders lodging false complaints to try to receive refunds on

their rides, a problem that Uber itself acknowledged.[16]

The Committee also considered data collected by the New York Taxi Workers

Alliance ("NYTWA") in 2025 and analyzed by the Asian American Legal Defense and Education

Fund ("AALDEF") which found that most of the deactivated Drivers were "long-time, high-

performing Drivers with high ratings and no record of misconduct, and were deactivated without

prior notice based on vague allegations of 'customer complaints.'"[17] Over 70% of Drivers reported

not receiving any notice prior to deactivation.[18] Drivers also reported that when deactivations were

due to multiple complaints, they were not informed of the earlier complaints prior to deactivation.[19]

Drivers reported an inability to pay rent or afford groceries as common consequences of

deactivation.[20]

In addition to the Committee Reports, on September 27, 2024, the Committee held

a public hearing on Int. 276 at which time it received oral and written testimony.[21] This included

testimony in support of Int. 276 from Drivers, NYTWA (which has 21,000 members), the National

Employment Law Project ("NELP"), Dollaride, a Brooklyn-based mobility company, Legal

Services NYC, and the Legal Aid Society.[22]

---

[14] *Id.*

[15] *Id.*

[16] *Id.*, p. 145:24.

[17] Ex. H, p.9; Ex. L, p.8.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] Exs. E, F.

[22] Ex. F.

Services testified in opposition to the bill at the September 27, 2024 hearing and through written testimony submitted to the Committee.[23] Notably, there is no indication in the legislative record that Plaintiff testified at the public hearings in opposition to the bill. *See generally*, Legistar website for Int 0276-2024 -A.[24]

On December 18, 2025, after careful consideration, Council introduced an amended bill, Int. 276-A. Int. No. 276-A defined "egregious misconduct" as any "conduct that poses an imminent danger to other persons, including but not limited to violence, threats to engage in violence, sexual harassment, or sexual assault" or "discrimination in violation of federal, state, or local law."[25] In addition, account sharing and a pattern of repeated fraudulent behavior were added to the list of conduct that excuses Services from providing 14-days' notice prior to deactivation.[26] To address Services' concerns about legal and regulatory compliance, deactivations required by law or rule were added to the list of reasons why a Service may deactivate a driver.[27]

Other amendments were made, including narrowing the data required to be produced to the driver upon deactivation and requiring redactions of personally identifiable information ("PII") of riders.[28] Additionally, the definition of "deactivation" was amended to provide flexibility for temporary restrictions of access, and language concerning the consideration of exculpatory evidence was added at the request of the Services.[29]

---

[23] *See id*. (testimony of Josh Gold); Ex. F, pp.54-55, 69-70.

[24] https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=6557685&GUID=B1AD10BE-3B1B-4782-8AE8-65B9C1E20563&Options=ID|Text|&Search=Int.+276-A

[25] Ex G.

[26] *Id*.

[27] *Id*.

[28] Ex. H, pp.13-14; Ex. L, pp.12-13.

[29] *Id*.

6

**B. Local Law 52 of 2026**

LL52 amends existing provisions of Chapter 12 of Title 20 of the Admin. Code to fold Drivers into established retaliation protections, complaint procedures, remedies, penalties, and enforcement tools, and adds a new Subchapter 8 of Chapter 12 (Admin. Code §§ 20-1281 – 20-1290). Under LL52, a Service may deactivate a driver for just cause, a bona fide economic reason (§ 20-1284), or where law requires. *Id.* § 20-1282(a). "Just cause," means that the Driver: (1) engaged in egregious misconduct, (2) failed to satisfactorily perform their job duties, or (3) engaged in any other misconduct that is demonstrably and materially harmful to the Service's legitimate business interests. *Id.* § 20-1281. For a deactivation on the second or third grounds, the Service must have engaged in progressive discipline pursuant to a written progressive-discipline policy that was provided to the Driver. *Id.* § 20-1282(c).

Except for deactivations for egregious misconduct, account sharing, or a pattern of repeated fraudulent behavior, Services must provide Drivers 14-days' notice of an impending deactivation (or 120-days' notice for a deactivation for a bona fide economic reason, *Id.* §§ 20-1282 d(i), 20-1284), stating the precise and detailed reasons for the impending deactivation, the effective date, and informing the Driver of their challenge rights. *See id.* 20-1282(d)(i)-(iv).

In determining whether a deactivation satisfies "just cause," a fact-finder considers whether the Driver knew or should have known of the rule (or policy or practice) the Driver violated, and the potential consequences of violating it, and whether the Driver actually committed the violation. Admin. Code § 20-1282 (b)(1), (7). A fact-finder also considers whether the rule relates to safe and efficient operations; whether adequate training was given; whether the rule was reasonable and consistently applied; whether the service undertook a fair and objective investigation; and whether deactivation was a reasonable response accounting for mitigating

7

circumstances. *Id.* § 20-1282 (b)(2)-(6).  These are non-exclusive; a factfinder may consider other relevant factors as well. *Id*.

Under Admin. Code § 20-1285, the Service bears the burden of proving just cause or a bona fide economic reason by a preponderance of the evidence. *Id.* § 20-1285(a).  A factfinder may not consider reasons that were not stated in the deactivation notice or written explanation for a prior deactivation. *Id.* § 20-1285(b).  Where a Driver is deactivated for egregious misconduct, a Service does not have to provide notice prior to the deactivation or use progressive discipline.  In addition, a deactivation for account sharing or in response to a pattern of fraudulent behavior does not require notice prior to deactivation.  In those circumstances, the Service must provide written notice within five days after deactivation.

LL52 has a 7-year lookback period for previously deactivated Drivers.  Within one year after the effective date of LL52, these Drivers may petition the Service for reinstatement. *Id.* § 20-1283(a).  A Service must reinstate the Driver within 30 days after receipt of such petition, unless the prior deactivation was for just cause, a bona fide economic reason, was required by law or rule, or occurred during the Driver's probation period.  If the Service does not reinstate the Driver, the Service must provide the Driver with written notice detailing the precise reasons for the prior deactivation and informing the Driver of their challenge rights. *Id.* § 20-1283(c).

Upon issuing a deactivation notice, a Service must also provide the Driver relevant information and data, including driving-performance data, customer comments, ratings, and complaints, and anonymized and aggregated reports on discipline imposed on other drivers for similar conduct over the prior 12 months. *Id.* § 20-1286(a).  Riders' PII must be redacted. *Id.* § 20-1286(b).  In the case of a petition to reinstate pursuant to Admin. Code § 20-1283, such information

8

and data must be provided only to the extent such information is available to the Service. *Id.* § 20-1286(c).

On July 6, 2026 the Department of Consumer and Worker Protection ("DCWP") published in the City Record proposed rules implementing LL52.[30] Included in the proposed rules are, *inter alia*, specifics as to information that may be redacted or withheld to protect rider identity or sensitive commercial information belonging to the Services. The proposed rules are currently open for public comment with a public hearing on the proposed rules scheduled for August 5, 2026.[31]

## C.  Uber and Lyft Disclose Rider Information

Uber discloses rider information to Drivers as part of its routine operations. For every trip, a Driver is told a rider's first name, pick up location and/or drop off location. *Uber Technologies, Inc., and Uber USA, LLC v. City of New York,* 26-cv-04893(GHW), ECF Doc. 1, Complaint ¶ 135 ("Uber Complaint"). If a Driver receives a negative report, Uber informs the Driver of the date of the trip, nature of the report, and the opportunity to submit relevant recordings. *Id*. at ¶ 110-112. Uber permits Drivers to record riders as part of their operations, and indeed, relies on those recordings as evidence if a Driver wishes to dispute a rider complaint or deactivation from the Service platform. *Id*. at ¶¶ 113, 119-121. Lyft has similar evidentiary expectations regarding documentation Drivers are expected to produce to challenge a potential deactivation. *Lyft Inc., v. City of New York*, 25-cv-04931(GHW), ECF Doc. 1, Complaint ¶¶ 22-24 ("Lyft Complaint").

---

[30] Ex. O

[31] *Id*.

9

Uber states that it will disclose specific rider comments, ratings, or complaints, along with the date, time, and location of specific incidents, to a Driver if it is necessary as part of legal proceedings. *Id*. at ¶¶ 20, 115.

## STANDARD OF REVIEW

Emergency injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citation modified).  Plaintiff must demonstrate that he is likely to succeed on the merits of his claim, is likely to suffer irreparable harm without preliminary injunctive relief, that the balance of equities tips in his favor, and that an injunction is in the public interest. *See Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 16 (2020) (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Plaintiff has not done so here.

## ARGUMENT

### POINT I

### PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS.

### A.  PLAINTIFF LACKS STANDING

Standing is a threshold question that must be addressed by a court in the first instance.  *See Warth v. Seldin*, 422 U.S. 490, 498 (1975).  The inquiry is "especially rigorous" when a court has to decide whether governmental action is unconstitutional.  *Raines v. Byrd*, 521 U.S. 811, 819-820 (1997).  As a general rule, "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991).

To establish standing, a plaintiff must demonstrate, *inter alia*, "an injury in fact—'an invasion of a legally protected interest which is (a) concrete and particularized, and (b)

10

actual or imminent, not conjectural or hypothetical.'" *Tafuto v. Donald J. Trump for President, Inc.,* 827 F. App'x 112, 114 (2d Cir. 2020) (citations omitted).  *See also Knife Rights, Inc. v. Cyrus Vance, Jr.*, 802 F.3d 377, 383 (2d Cir. 2015).  Along with the injury in fact component, a plaintiff must establish a sufficient causal connection between the injury and the conduct complained of and a likelihood that the injury will be addressed by a favorable decision.  *Susan B. Anthonys List v. Driehaus*, 573 U.S. 149, 134 S. Ct. 2334 (2014).  Here, Plaintiff has failed to establish that he has standing to challenge LL52 on his own behalf, or on behalf of others, including the Services or Drivers.

**1.  Plaintiff Does Not Sufficiently Allege An "Injury-In-Fact"**

On its face, LL52 regulates the working relationship between Services and Drivers. It does not regulate riders, like Plaintiff.  Thus, it is unclear what non-speculative injury Plaintiff can directly attribute to LL52.  Seemingly acknowledging this crucial defect in his case, Plaintiff tries to stand in the shoes of the Services in Claims I and II.  He rhetorically positions himself as if he were a trademark holder (i.e., a Service) enforcing a brand interest whose speech rights are allegedly impacted by LL52. Plaintiff Memo of Law at 16-20, ECF Doc. 6 ("Pl. Mem."). Yet, Plaintiff has no ability to do so. *See JC Hosp. v. Hochberg*, 703 F. Supp. 3d 448, 464 (S.D.N.Y. 2023)("Plaintiffs are neither the owners nor the assignees of the trademarks, and therefore they lack standing to sue for dilution under [the Lanham Act]"). *See also Powers*, 499 U.S. at 410 (holding that as a general rule, "a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."). Therefore, any alleged First Amendment claims he makes on behalf of Services as trademark holders, including an alleged dilution of Uber or Lyft's "mark," cannot reasonably be construed to result in an injury-in-fact to Plaintiff.

Nor for that matter can Plaintiff satisfy the third-party standing doctrine. Under the third-party standing doctrine, a litigant must satisfy three criteria: (i) "[t]he litigant must have suffered an 'injury in fact'"; (ii) "the litigant must have a close relation to the third party"; and (iii) "there must exist some hindrance to the third party's ability to protect his or her own interests." *Id.* at 410-11 (internal citations omitted). On all fronts, Plaintiff fails to satisfy this standard. As already detailed, Plaintiff fails to establish that he has, or will, personally suffer an injury in fact from LL52. Moreover, Plaintiff, as one of undoubtedly hundreds of thousands of riders in New York City, cannot establish that he is a "close relation" to Uber or Lyft, or that those multi-billion dollar corporations are incapable of protecting their own interests. Indeed, as this Court is aware, Uber and Lyft have commenced related lawsuits challenging LL52. The fact that Uber and Lyft have not raised Plaintiff's First Amendment trademark argument is not indicative of an inability to protect their own interests. It is an indication that such argument lacks merit. Accordingly, Claims I and II, which are based on alleged harm to the Services, cannot justify a grant of preliminary injunctive relief.[32]

Likewise, Plaintiff invokes *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Counsel*[33] and *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*[34] in support of his assertion that he has a constitutionally cognizable right as a listener to receive accurate commercial information. Pl. Mem. at 15. Importantly, Plaintiff does not allege LL52 requires Services to communicate non-factual, inaccurate information. Plaintiff again is attempting to borrow the language of the Lanham Act and trademark enforcement to construe an argument where one does not exist. Once distilled, it appears that Plaintiff argues that LL52 forces a Service to

---

[32] The same reasoning applies to Claim V regarding "conscientious drivers."
[33] 425 U.S. 748 (1976)
[34] 477 U.S. 557 (1980)

falsely advertise its "quality" of drivers. *Id.* at 14. However, as the Supreme Court held in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, "to come within the zone of interests in a suit for false advertising [under the Lanham Act], a plaintiff must allege an injury to a commercial interest in reputation or sales," 572 U.S. 118, 131-132 (2014). Here, Plaintiff alleges no such injury.

In Plaintiff's Claims III and IV, he alleges he will potentially be injured by LL52 because knowing that comments and complaints he may make about Drivers could be disclosed to them, infringes on his "First Amendment [] right to deliver that speech without compelled exposure to the person criticized." Pl. Mem. at 20. Plaintiff states that his fear that the information disclosed to Drivers pursuant to LL52 could lead to rider identification would effectively chill his speech. Yet, in the same breath, Plaintiff states he "intends to keep using rider ratings, comments, and complaint channels" to report Driver behavior. *Id.* at 14. This purported injury is purely speculative. First, the fact that Plaintiff has affirmatively stated that he "intends to keep using" rider complaint channels, undermines any assertion that his speech is chilled. *See Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)(stating that "[w]here a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech."). Second, as detailed in LL52, rider PII must be redacted from any complaint information turned over to Drivers. Accordingly, Plaintiff's concerns about rider identification are overblown. Third, Plaintiff's claim of chilled speech is further undercut by Uber's representation in its own case that it already turns over much of this information when required by law or for its existing driver deactivation processes. *See*, Uber Compl. ¶¶ 135, 110-112. Plaintiff represents that he currently uses complaint channels offered by the Services. Pl. Mem. at 14.

While Plaintiff cites *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) and *Ams. For Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) for the proposition that disclosure of

13

individuals' identities to the government, when they choose to be anonymous, is an infringement on First Amendment protections, these two cases are inapposite. These two cases are First Amendment association cases involving membership lists of advocacy and charitable groups being turned over to the government. Stating the obvious, Services are not advocacy groups, nor are they charities, and Plaintiff is not a "member" of any such organization. Moreover, any rider PII is reacted, and the redacted rider information detailed in LL52 is not being turned over to the government.

The same reasoning extends to Plaintiff's speculative injury alleged in Claim IV that LL52 could be used by a Driver to bring a civil suit against a rider.  In support of this argument, Plaintiff selectively cites to Admin. Code Section 20-1204(a) and 20-1211(a)(1), while ignoring Section 20-1211(b) which sets forth specific remedies for violations of 20-1204(a).  Section 20-1211(b) lists remedies for unlawful retaliation by Services toward Drivers – *not* Drivers toward riders. Riders cannot discipline or terminate Drivers. *See* Pl. Mem. at 22; Section 20-1211(b). Plaintiff misconstrues the retaliation protection and provides no reasonable explanation for how a truthful complaint to the Service by a rider about a Driver's conduct could be understood as penalizing a Driver for exercising, or attempting to exercise, a right under LL52.

As a result, Plaintiff clearly fails to establish any pre-enforcement injury-in-fact caused by LL52 warranting review by this Court at this time, and as all of Plaintiff's alleged future injuries are purely speculative, Plaintiff lacks standing and his motion for a preliminary injunction must be denied.

## B. PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED PURSUANT TO THE EQUITABLE DOCTRINE OF LACHES

A preliminary injunction "is not a remedy which issues as of course." *Weinberger v. Romero-Bancelo*, 456 U.S. 305, 311 (1982).  In exercising its sound discretion to determine a

motion for a preliminary injunction, a court of equity may consider a number of factors including whether the moving party is guilty of unreasonable delay.

It is well established that the defense of laches bars a plaintiff's claim for equitable relief if the "plaintiff in asserting his right is guilty of unreasonable delay that prejudice[s] the defendants." *Stone v. Williams*, 873 F.2d 620, 623 (2d Cir.), *cert. denied*, 493 U.S. 959, *vacated on other grounds*, 891 F.2d 401 (2d Cir. 1989). *See also National Council of Arab Americans v. City of New York*, 331 F.Supp.2d 258, 265 (S.D.N.Y. 2004) (denying motion for preliminary injunction when lawsuit to challenge denial of demonstration permit was brought one and a half months after the denial of the permit and a mere fifteen days before the proposed demonstration); *Irish Lesbian and Gay Organization (ILGO) v. Giuliani*, 918 F.Supp. 732, 748 (S.D.N.Y. 1996) (holding that ILGO was "guilty of laches for failing to bring the lawsuit earlier when the position of the parties could be thoroughly presented"); *WPIX v. League of Women Voters*, 595 F. Supp. 1484, 1494 (S.D.N.Y. 1984) (denying preliminary injunction request by television station to broadcast presidential debate in part because "WPIX's eleventh-hour demand for access ha[d] ... unjustly burdened the [defendant] with the task and expense of responding to a set of difficult legal issues on short notice.").

Here, Plaintiff has unreasonably delayed in seeking injunctive relief. Former Mayor Adams' veto of LL52 was overridden on January 29, 2026, with the law due to go into effect 180 days later on July 28, 2026. Instead of filing promptly, Plaintiff waited until 30 days before the law is scheduled to take effect to file and weeks after the Services brought their own highly-

15

publicized lawsuits challenging LL52.[35]  Moreover, Plaintiff's filing appears to have been timed to allow Plaintiff the opportunity to view the City's opposition to the Uber and Lyft motions, while also ensuring maximum disruption to the City's preparation for the July 16, 2026 hearing ordered in the Uber and Lyft cases, thereby causing prejudice to the City. Indeed, Plaintiff's counsel emailed directly the two City attorneys assigned to the Uber and Lyft cases on Sunday June 28th, with only a copy of the complaint, asking those two attorneys to file notices of appearance and waive service (even though no summons had been issued yet) so this case could be joined with Uber and Lyft for the July 16th hearing.[36]  In doing so, Plaintiff was seemingly attempting to force those attorneys to devote the two weeks before the July 16th hearing to responding to his new motion for a preliminary injunction, rather than preparing for the hearing.

Such gamesmanship should not be countenanced by this Court.  Plaintiff's delay is unreasonable and prejudices both the City and the workers who have been waiting for LL52 to go into effect.  Under the current schedule, the briefing of the motion will not be completed until just four days before LL52 is scheduled to take effect, with a hearing scheduled the day before the law takes effect. Should Plaintiff prevail on this motion, Defendant will not have the opportunity to perfect a full appeal in advance of the July 28, 2026 effective date.  *See MacDonald* and *ILGO*, *supra,* denying preliminary injunction relief where delay in filing motions prejudiced defendants by effectively denying them the opportunity for full appeal and thorough presentation of their defense.  This further weighs against the grant of preliminary relief.  Accordingly, the motion should be denied based on the doctrine of laches.

---

[35] *Lyft, Uber Sue New York City to Block Driver Retention Law*, U.S.News (June 11, 2026), https://www.usnews.com/news/top-news/articles/2026-06-11/lyft-uber-sue-new-york-city-to-block-driver-retention-law; Last accessed July 17, 2026.

[36] Ex. N.

## C.  LL52 DOES NOT IMPERMISSIBLY COMPEL PLAINTIFF'S SPEECH.

Plaintiff alleges various provisions of LL52 compel Services to alter the content of their speech and to speak in a way preferred by the City. *See* Pl. Mem. at 16.  Specifically, Plaintiff challenges provisions that require the Services to provide notice to Drivers listing reasons for deactivation and inform them of their right to challenge deactivation. (Admin. Code §§ 20-1282(d)-(e); 20-185(b))(collectively the "Notice Provisions"). Plaintiff also challenges provisions requiring Services to provide deactivated Drivers with information and data relevant to their deactivation upon issuance of such notice, including but not limited to driving performance, customer comments, ratings, and complaints, and anonymized and aggregated reports covering other Driver deactivations for the same or similar grounds (Admin. Code § 20-1286) (the "Data Sharing Provision").   Uber concedes to already providing Drivers with some notice and explanation of deactivation. *See* Uber Comp. ¶¶ 135, 110-112. Thus, the challenged provisions merely require Services to provide more information than they otherwise would so that Drivers can better understand the reasons for deactivation and more effectively respond. Accordingly, Plaintiff is unlikely to succeed on the merits of his compelled speech claim because the challenged provisions do not implicate the First Amendment.

The Notice and Data Sharing Provisions regulate conduct—specifically, worker discipline—not speech, and any burden on expression is incidental to LL52's broader scheme of regulating the deactivation process.  Even if these provisions did implicate the First Amendment, they satisfy the lesser scrutiny applied to compelled commercial-speech disclosures because the challenged provisions are reasonably related to the governmental interest of preventing abrupt and unwarranted worker deactivations.

17

1.  **The Notice and Data Sharing Provisions Regulate Conduct, Not Speech.**

While requiring the Services to provide notice and other relevant information to Drivers regarding deactivations requires the Services to put words on a webpage (or screen), the provisions do not abridge freedom of speech "merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).  The Notice and Data Sharing Provisions, at most, impose "incidental burdens on speech" to further the legislative goals. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  *See also Council for Responsible Nutrition v.  James*, 159 F.4th 155, 167 (2d Cir. 2025) (regulation requiring inclusion of an age verification prompt on company's website does not implicate First Amendment, because "any burden on expression is incidental to an otherwise legitimate regulation.").

The Notice and Data Sharing Provisions do not dictate the specific words that must be used, nor do they compel Services to convey any value-laden message.  They merely regulate the *process* a Service must undertake when it wishes to deactivate a Driver on its platform, which incidentally requires a Service to convey certain information to the Driver so that the Driver can understand the reasons for deactivation and contest it.  Thus, the challenged provisions "affect what [Services] must *do*" — provide drivers with appropriate process related to potential deactivations—"not what they may or may not *say*." *Rumsfeld v. FAIR.*, 547 U.S. 47, 60 (2006) (emphases in original).  As such, they fall outside the First Amendment's reach.

Of note, in *Wheely USA, Inc. v. City of New York*, 26-cv-091957, 2026 U.S. Dist. LEXIS 79548 (S.D.N.Y. Apr. 10, 2026), the Court recently found that reporting requirements, which require FHV bases to collect and transmit certain trip records on a monthly basis to TLC and file statements pertaining to the collection and maintenance of certain data, do not implicate the First Amendment.  Important to the Court's analysis was that the required reporting did not

18

"reflect a compelled endorsement of any governmental message, and Plaintiffs remain free to express their disagreement with the Rules." *Id.* Ultimately, the Court found that because such "communications arise from a broader regulatory scheme governing economic activity," even to the extent it required FHV bases to communicate with users regarding data practices, they are "'plainly incidental' to the regulation of conduct." *Id.* at *81–*82 (*quoting Rumsfeld*, 547 U.S. at 62). Likewise here, the communications required by the Notice and Data Sharing Provisions are incidental to the broader scheme of regulating the deactivation process for workers, do not reflect an endorsement of any government message, and do not prevent the Services or Plaintiff from expressing their disagreement with the statute. *See Cornelio v. Rosado*, 24-cv-01335, 2025 U.S. Dist. LEXIS 191250, at *11 (N.D.N.Y. Sept. 29, 2025).

The *conduct* regulated by the Notice and Data Sharing Provisions also does not fall within the First Amendment's protection as it is not "inherently expressive." *Rumsfeld*, 547 U.S. at 65–66 (*quoting United States v. O'Brien*, 391 U.S. 367, 376 (1968)). As regulation of the deactivation process does not contain a "significant expressive element," the First Amendment is not implicated. *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986). Recently, the Ninth Circuit in *Uber Techs., Inc. v. City of Seattle*, 168 F.4th 1202 (9th Cir. Mar. 4, 2026), confirmed as much when it found that a Seattle ordinance that required companies to inform app-based workers in writing of the company's deactivation policy did not implicate the First Amendment. The Court noted that "[t]he fact that the Ordinance, in Plaintiffs' words, necessarily 'compel[s] and dictate[s] the content of a written communication' does not transform a law regulating nonexpressive activity into one that infringes speech," *id.* at 1213, and that, at its core, the notice requirement regulated a business agreement, which "is not conduct with a significant expressive element," *id.* at 1211. Similarly here, that the Notice and Data Sharing Provisions compel certain communications does

19

not trigger First Amendment scrutiny, since the provisions ultimately regulate the nonexpressive activity of worker discipline.  And, in the end, the Second Circuit has found that the hiring and firing of workers (which is what a deactivation decision entails) is nonexpressive in nature. *See Compasscare v. Hochul*, 125 F.4th 49, 68 (2d Cir. 2025); *Slattery v. Hochul*, 61 F.4th 278, 291 (2d Cir. 2023).

   i.   **LL52 Implicates At Most Commercial Speech.**

Plaintiff frames his claims around his alleged right to receive commercial speech. Therefore, even if the Notice and Data Sharing Provisions are found to have more than an incidental effect on speech, and therefore implicate the First Amendment, they concern only commercial speech, which "enjoys 'a limited measure of protection.'" *Bd. of Trs. v. Fox*, 492 U.S. 469, 477 (1989) (*quoting Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456 (1978) (citation modified)).  The Supreme Court has defined commercial speech as "expression related solely to the economic interests of the speaker and its audience," or, alternatively, as speech "proposing a commercial transaction." *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 560–61 (1980).  Here, the speech required by the Notice and Data Sharing Provisions relate to worker discipline, i.e., Driver performance and conduct, which is intrinsically related to the commercial relationship between Services and its Drivers – not riders. *See Compasscare*, 125 F.4th at 65 (requirement that employers issue employee handbooks with information regarding employees' rights and remedies implicated commercial speech).

Following this logic, the *Wheely* Court found that even if the challenged regulations there implicated speech, they regulated commercial speech, because "[t]he communications at issue—statements to workers about the terms and conditions of their engagement—were 'directly related to employment' and thus commercial in nature." 2026 U.S. Dist. LEXIS 79548, at *85 (*quoting Uber Techs.*, 168 F.4th at 1215).  Hence, it is a matter of "commonsense" that the Notice

and Data Sharing Provisions implicate, at most, commercial speech. *See Cent. Hudson*, 447 U.S. at 562.

### a. LL52 is Subject to, and Satisfies, Rational Basis Review under *Zauderer*.

Non-misleading commercial speech is entitled to less First Amendment protection than other expression. *Cent. Hudson*, 447 U.S. at 562–63. Generally, restrictions on commercial speech are subject to intermediate scrutiny and analyzed under the four-part test set forth in *Central Hudson*. However, both the Supreme Court and Second Circuit have found that laws that require, rather than restrict, commercial speech, as is the case here, are subject to a form of more deferential rational basis review. *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985).[37] A regulation compelling commercial speech does not violate the First Amendment if it is "reasonably related to the State's interest" and is neither "unjustified or unduly burdensome." *Compasscare*, 125 F.4th at 64, 67.

To the extent that the First Amendment is implicated, this form of review applies because the Notice and Data Sharing Provisions require platforms to provide "purely factual and uncontroversial information"—information that informs a driver of the basis of their job loss and how to challenge it—and do not restrict any speech. *See Zauderer*, 471 U.S. at 637, 651; *Compasscare*, 125 F.4th at 64–65. Of note, Plaintiff does not contest that the information required to be disclosed—notice of impending deactivations; reasons for deactivation; data relevant to the reason for deactivation; and means to challenge deactivation—is purely factual in nature.

Instead, Plaintiff argues that Services, not Plaintiff, are being compelled to share data and communicate information to Drivers that they otherwise would not communicate.

---

[37] "[T]he Second Circuit has applied *Zauderer* to commercial disclosures . . . beyond the narrow context of deception cases." *Doordash, Inc. v. City of New York*, 25-cv-10268, 2026 U.S. Dist. LEXIS 12619, at *11 (S.D.N.Y. Jan. 22, 2026).

21

However, *Zauderer* specifically contemplates mandated disclosures by the government, so arguing that the challenged provisions simply require Services to say something they do not wish to say does not warrant higher scrutiny. Further, "[t]he Second Circuit has been clear that a commercial disclosure is not rendered 'controversial' merely because the regulated entity does not wish to make that disclosure or because they would prefer to make a different statement on that same topic." *Nat'l Retail Fed. v. James*, 25-cv-5500, 2025 U.S. Dist. LEXIS 199836, at \*16 (S.D.N.Y. Oct. 8, 2025). There is nothing "controversial" about informing Drivers of decisions, policies, and data that directly impact them. *See Uber Techs.*, 168 F.4th at 1215 (even if the mandated disclosures implicated speech, *Zauderer* applies because communication of policies that workers are subject to is purely factual in nature and not controversial); *Wheely*, 2026 U.S. Dist. LEXIS at \*86 (if speech was implicated, *Zauderer* applies because required disclosures did not require plaintiffs to take sides in a political controversy or express any opinions).

The Second Circuit has applied *Zauderer*'s less demanding scrutiny to commercial disclosure requirements, such as those here, "because mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberties." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001). Here, the mandated disclosure of truthful, factual, commercial information that will better inform drivers of the grounds for their deactivations and their ability to challenge them, certainly "furthers, rather than hinder, the First Amendment goal of the discovery of truth" and "the robust and free flow of accurate information." *Id.* Thus, to the extent that the challenged provisions implicate speech, they are subject to rational basis review. *See Va. State Bd. of Pharm.*, 425 U.S. at 770.

22

The Notice and Data Sharing Provisions easily satisfy this standard. To satisfy rational basis review, the government does not have to produce evidence or empirical data to sustain rationality; instead, it can rely upon "rational speculation." *Lewis v. Thompson*, 252 F.3d 567, 582 (2d Cir. 2001). Nor for that matter does the government have to establish that the statute eliminates all the evils it was designed to ameliorate. *See Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 115–16. Here, because there is a reasonable relationship between the intended purpose of the challenged provisions and the means employed to achieve that purpose, and because the challenged provisions are neither "unjustified [n]or unduly burdensome," *Compasscare*, 125 F.4th at 64, 67, Plaintiff cannot establish the Notice and Data Sharing Provisions violate the First Amendment.

### b. The Challenged Provisions Satisfy Intermediate Scrutiny.

If *Zauderer* did not apply, the Notice and Data Sharing Provisions would be subject to intermediate scrutiny under *Central Hudson*. To survive intermediate scrutiny, the commercial speech must concern lawful activity and not be misleading, the asserted governmental interest must be substantial, and the regulation must directly advance the governmental interest and not be more extensive than necessary to serve that interest. *Cent. Hudson*, 447 U.S. at 566. The Notice and Data Sharing Provisions involve the disclosure of factual, uncontroversial information and thereby satisfy the first prong. *See* 447 U.S. at 566. Moreover, these provisions directly advance the important government interests of limiting abrupt and unjustified driver deactivations. Therefore, the challenged provisions satisfy intermediate scrutiny.

Studies and anecdotal evidence also highlight the very real possibility that deactivations can be based on false or unreliable complaints, further emphasizing the need to ensure that Drivers have access to the information related to their deactivation and have a meaningful opportunity to challenge such deactivations. As mentioned above, a survey conducted

23

by the Asian Law Caucus revealed that two out of three Drivers experienced discrimination, sexual harassment, or other forms of misconduct or customer bias while driving for the Services.[38]  Half of the Drivers who faced racial discrimination from a customer were also reported *by* that customer.[39]  Other times, they are deactivated due to complaints from intoxicated or unruly customers; those who want the Driver to violate a traffic rule; and even when the Driver refused a sexual advance of a customer.[40]  This testimony highlights the need for Drivers to obtain more information about their deactivations in order to meaningfully fight unwarranted deactivations.

Finally, the Notice and Data Sharing Provisions are no more burdensome than necessary.  As discussed above, Services concede they already provide Drivers with some of the same notice and information required by the challenged provisions, so the added burden of the challenged provisions, if any, is minimal.

In the end, the City is afforded "considerable leeway in determining the appropriate means to further a legitimate government interest." *Vugo, Inc. v. City of New York*, 931 F.3d 42, 58 (2d Cir. 2019)(the Second Circuit is "loath to second-guess the government's judgment" (citation modified)).  Here, Council carefully considered both empirical and anecdotal evidence and crafted the Notice and Data Sharing Provisions to directly advance the substantial government interest in limiting deactivations without warning, justification, or a meaningful opportunity to be heard.  For these reasons, even if intermediate scrutiny applies, the challenged provisions survive.

### ii.    Strict Scrutiny Does Not Apply.

To the extent Plaintiff argues that strict scrutiny applies because the challenged provisions are content-based restrictions and compel Services to engage in non-commercial

---

[38] Ex. H, pp.8-9; Ex. L, p.7.
[39] *Id.*
[40] *Id.*

24

speech, namely disclosing its internal processes and rider data in a manner and method that it otherwise would not, such arguments fail. *See* Pl. Mem. at 17, 19-20.  However, as discussed above, any speech implicated by the Notice and Data Sharing Provisions is commercial in nature. *See, e.g., N.Y. State Rest. Ass'n*, 556 F.3d at 131.  Thus, even if the challenged provisions were content-based, they would still be subject to, at most, intermediate scrutiny. *See Vugo*, 931 F.3d at 50  ("Following *Sorrell*, this Court has continued to apply *Central Hudson*'s intermediate scrutiny test to commercial speech restrictions.").  As such, strict scrutiny does not apply.[41]

### D.    LL52 DOES NOT IMPERMISSIBLY COMPEL EXPRESSIVE ASSOCIATION.

The First Amendment protects the right to "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends," *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984) and the right to exclude potential members "in order to foster the group's shared interest in particular speech," *Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 858 (2d Cir. 1996).  However, in the employment context, First Amendment protections of expressive association are more limited. "[T]he right to expressive association is implicated only when the employment decision 'goes to the structure and identity of the association as an association.'" *Compasscare*, 125 F.4th at 61 (*quoting Slattery*, 61 F.4th at 290).  Plaintiff alleges that the 14-days' notice requirement (Admin. Code § 20-182(d)), and the opportunity for Drivers to contest the factual basis of a prior deactivation should they choose to petition for reinstatement (*Id.* § 20-186), compel expressive association in violation of the First Amendment by forcing Services to include an "unwanted driver" under its trademark which implicates the "signal" Plaintiff receives about the Service. Pl. Mem. at 19 (*citing Boy Scouts of*

---

[41] Should the Court find strict scrutiny applies, the Notice and Data Sharing Provisions meet this threshold because the governmental interest is compelling, they achieve the goals Council sought to address, and they are narrowly tailored.

*America v. Dale*, 530 U.S. 640, 648 (2000)).  However, as these provisions do not infringe on Plaintiff's ability to advocate his viewpoints, let alone go to the structure and identity of the Service as an association, Plaintiff is not likely to succeed on the merits of his compelled association claim.

Finally, to the extent that Plaintiff contends that LL52 threatens his receipt of information regarding Services' purported reputations for safety, reputation is not expression, and in any event, the contention is false. *See* Pl. Mem. at 19.  First, LL52 explicitly contemplates and allows immediate deactivations without advance notice by the Services for egregious misconduct, account sharing, or a pattern of repeated fraudulent behavior. Admin. Code § 20-1282(d).  Second, LL52 does not require reinstatement for Drivers deactivated for just cause, including, unsafe behavior.  Third, existing TLC regulations and Second Circuit case law, which must be considered alongside LL52, authorize TLC to immediately suspend a driver's TLC license when they have been arrested for certain offenses or have engaged in unsafe behavior, including but not limited to driving under the influence of drugs or alcohol, any acts of fraud, harassment, or abuse, and possession of a weapon in a FHV. *See Nnebe v. Daus*, 931 F.3d 70–71; 35 RCNY § 68-15(a)(1). Accordingly, Plaintiff's protestations that he will be forced to engage with a Service that may allow dangerous individuals to remain on their platforms and be forced to unwillingly associate with them, is nothing but a red herring and insufficient to support a claim that LL52 infringes on his protected expressive association.

For the reasons discussed in Point I(C)(1), *supra*, the requirement, with appropriate exceptions, that the Services provide Drivers with 14-days' notice of an impending deactivation is rationally related to the important government goal of preventing unwarranted deactivations with no warning.  And for reasons discussed in Point I(C)(a), *supra*, the opportunity for Drivers to contest the validity of prior deactivations, should they petition for reinstatement, is rationally

26

related to the important purpose of ensuring that unwarranted deactivations do not prevent a person from earning a living going forward.  Because the challenged provisions satisfy rational basis review, Plaintiff is not likely to succeed on the merits of his freedom of association claim.

**POINT II**

**PLAINTIFF   CANNOT   ESTABLISH
IRREPARABLE HARM.**

Plaintiff contends that if LL52 goes into effect: (1) he will receive non-trademark or brand-approved information regarding a Driver when he selects a ride; 2) he will not know if a Driver is operating with a Service because a Service elects to keep the Driver or the Driver has claimed rights under LL52 to process before deactivation; and 3) he will be chilled from candidly reporting concerns about a Driver. Yet, none of these conclusory and unsupported allegations substantiate that Plaintiff will suffer irreparable harm without injunctive relief. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)("irreparable harm is the single most important prerequisite . . .")(citation modified).  *See also Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, 10-Civ.-8976, 2011 U.S. Dist. LEXIS 14524, at *17 (S.D.N.Y. Feb. 10, 2011).

"Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York v. U.S. Dep't of Homeland Sec.*, 969 F. 3d 42, 86 (2d Cir. 2020)(citation modified).  Here, Plaintiff cannot allege *per se* irreparable harm as a result of a violation of his constitutional rights because, as discussed *supra*, Point I, LL52 does not violate the First Amendment.

27

Moreover, as discussed in Point I.A. *supra*, Plaintiff has not alleged any injury-in-fact that would reasonably constitute harm, let alone irreparable harm. For all of these reasons, Plaintiff cannot establish that he will suffer irreparable harm if LL52 goes into effect.

### POINT III

### THE BALANCE OF THE EQUITIES TIPS STRONGLY IN THE CITY'S FAVOR.

Plaintiff cannot show that the balance of equities weighs in his favor, and that a preliminary injunction is in the public interest. *See Winter,* 555 U.S. at 20. "[A] court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)(*citing Winter*, 555 U.S. at 20). It further must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief[.]" *Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020).

The record demonstrates that unwarranted Driver deactivations negatively impact Drivers and the public at large. Drivers are harmed directly through the immediate loss of income, and the general public is harmed indirectly through the Driver's sudden inability to pay bills and increased reliance on public assistance. The currently available remedies offered by the Services for wrongfully deactivated Drivers (which Council testimony revealed are internal and secretive) are largely only available *after* deactivation, when the harm has already taken place. Enjoining LL52 will allow the inequities faced by Drivers to persist. Therefore, the motion should be denied. *See Doordash, Inc. v. New York City. Dep't of Consumer & Worker Protect.*, Index. No. 155947/2023, 2023 N.Y. Misc. LEXIS 6071 (Sup. Ct. N.Y. Cnty Sept. 27, 2023)(declining to enjoin minimum pay rate for food delivery workers because, in part, petitioners could not show

28

the balance of the equities favored them over the vulnerable class of workers that the laws were created to protect); *Doordash, Inc.*, 2026 U.S. Dist. LEXIS 12619, at \*17–\*18.

## CONCLUSION

The City respectfully requests that this Court deny the motion for a preliminary injunction in its entirety, together with such other and further relief as this Court deems just and proper.

Dated:       New York, New York
             July 17, 2026

                                        **STEVEN BANKS**
                                        Corporation Counsel of the City of New York
                                        *Attorney for Defendant*
                                        100 Church Street
                                        New York, New York 10007
                                        (212) 356-2196

                              By:       _____

                                        Taylor Anvid
                                        *Assistant Corporation Counsel*

29

## WORD COUNT CERTIFICATION

According to Microsoft Word, the portions of this memorandum of law that must be included in a word count, pursuant to Local Civil Rule 7.1 and the Part's Individual Practices in Civil Cases, contain 8,745 words (including footnotes), exclusive of cover page, table of contents, table of authorities, signature block, and this certification.

Dated:      New York, New York
            July 17, 2026

STEVEN BANKS
Corporation Counsel of the City of New York
*Attorney for Defendant*
100 Church Street
New York, New York 10007
(212) 356-2196

By:      _____

        Taylor Anvid
        *Assistant Corporation Counsel*